```
McGREGOR W. SCOTT
United States Attorney
STANLEY A. BOONE
Assistant U.S. Attorney
4401 Federal Building
2500 Tulare Street
Fresno, California 93721
Telephone: (559) 497-4000
```

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | 01: 06-CR-00321 OWW |
|            Plaintiff,      ) | GOVERNMENT'S RESPONSE TO |
|                            ) | DEFENDANT'S MOTION FOR |
|         v.                 ) | RECONSIDERATION OF DETENTION |
|                            ) | ORDER |
| ABDULLA KASEM AHMED MUTHANA, ) | |
|                            ) | DATE: April 30, 2007 |
|            Defendant.      ) | TIME: 1:30 p.m. |
|                            ) | DEPT: Hon. Oliver W. Wanger |
| _____) | |

TO:   THIS HONORABLE COURT, DEFENDANT AND HIS ATTORNEY OF RECORD

    The United States of America, by and through McGregor W. Scott, United States Attorney, and Stanley A. Boone, Assistant United States Attorney, respectfully responds to the defendant's Motion for Reconsideration of Detention Order of the Magistrate Judge.

**STATEMENT OF FACTS**

    The defendant is the owner of Ranchito Market, 2749 Whitley Avenue, Corcoran, California, and the Ranchito Market II, 2838 Waukena Drive, Tulare, California.  The defendant was born in Yemen and is presently a lawful permanent resident of the United States.

    Between September 28, 2005, and January 12, 2006, Muthana

received a total of 324 EDD checks with a face value totaling $209,130.00 from a law enforcement officer and a person acting at the direction, and with the approval of, a law enforcement officer.

Through a series of consensually recorded conversations the defendant agreed to cash what he believed to be unlawfully obtained State of California unemployment checks for a negotiated fee. Through an agreement established with the United States Department of Labor and the California EDD, and the FBI's Joint Terrorism Task Force, agents were provided with valid EDD checks to be used for the operation. On September 28, 2005, a State of California Department of Justice agent, acting in an undercover capacity, posed as the producer of the EDD checks and provided an initial batch of fifty-eight (58) checks to the defendant, totaling $36,984.00. The defendant agreed to cash the checks for a fee of $50.00 per check and subsequently cashed them through a series of deposits into the Ranchito Market business account. The fifty-eight (58) checks were deposited into the Ranchito Market business account held at the Bank of the West, on the following dates: September 29, 2005, 14 checks; September 30, 2005, 12 checks; October 3, 2005, 16 checks; October 5, 2005, 8 checks; October 7, 2005, 4 checks; and October 11, 2005, 4 checks.

During the first meeting, which was a consensually monitored conversation, the Undercover Agent advised the defendant that his checks were "right off the factory" and told the defendant that he (undercover agent) had a relative that works on the inside. The Undercover Agent explained to the defendant not to cash too many checks per day because the banks will start to ask questions. The

defendant replied, "Oh yeah, yeah, no, I have to take care of my business too." The undercover agent stated he was told that the defendant wanted drivers license numbers and signatures on each check and the defendant replied, "Yeah, yeah, the deal was, but now they need the fingerprint." The defendant advised he needed them (fingerprints) for the bank so that there were no problems. The undercover agent asked the defendant if he could handle large amounts of checks every two weeks. The defendant said yes, but indicated that he could only put them through the bank in small numbers per day. The undercover agent discussed that they needed to have trust in one another and the defendant replied, "We have to stick together."

On November 16, 2005, the defendant was provided with the second batch of one hundred and eight (108) EDD checks, totaling $69,980.00. The defendant again agreed to cash the checks for a fee of $50.00 per check and subsequently cashed them through a series of deposits into the Ranchito Market business account. On December 9, 2005, the defendant was provided with the third batch of eighty-four (84) EDD checks, totaling $53,430.00. The defendant agreed to continue to cash the checks for a fee of $50.00 per check and subsequently cashed them through a series of deposits into the Ranchito market business account. On December 22, 2005, the defendant was provided with the fourth and final batch of seventy-four (74) EDD checks, totaling $48,736.00. The defendant agreed to cash the checks for an increased fee of $60.00 per check and subsequently cashed them through a series of deposits into the Ranchito Market business account. On January 12, 2006, Fresno JTTF coordinated a consensually monitored meeting

between the defendant, the Undercover Agent and another to recover the balance of the check transaction. This was the second and final meeting between the defendant and the Undercover Agent regarding the EDD undercover operation. During the meeting, the defendant provided the Undercover Agent with $44,296.00 in cash and kept $4,440.00 as his fee for cashing the checks. The defendant negotiated all of the 324 EDD checks for a total amount of $209,130.00 through his Ranchito Market business account, between September 29, 2005, and January 9, 2006. For the service of exchanging cash for these checks, the defendant demanded and received a total payment of $16,940.00. The defendant received approximately 8.1 % of the total amount laundered for this service.

    In September 2006, the FBI Buffalo Joint Terrorism Task Force advised members of the Fresno FBI-JTTF that during an ongoing Buffalo investigation involving money laundering and unlicenced money transmitting, one of the Buffalo subjects stated an individual in California could move $100,000.00 overseas without problems. Buffalo agents, with the assistance of the Fresno JTTF, identified the California individual as the defendant. Thereafter, an Immigration and Customs Enforcement Confidential Witness (ICE CW) was introduced telephonically to the defendant by a Buffalo subject. Several consensually monitored phone calls were made between the Immigration and Customs Enforcement Cooperating Witness and the defendant discussing the movement of money overseas. The Immigration and Customs Enforcement Cooperating Witness arranged to meet with the defendant in Fresno, California, on November 11, 2006, in order to personally make

arrangements for the movement of $60,000.00 overseas and to establish a possible future ongoing business relationship.

On November 11, 2006, a joint undercover money laundering sting operation took place at the Piccadilly Inn, Room 137, located at 5115 East McKinley Avenue, Fresno, California. The consensually monitored meeting (audio and video) involved the defendant, an Immigration and Customs Enforcement Undercover Agent, an Immigration and Customs Enforcement Cooperating Witness and a FBI Cooperating Witness. During the meeting, the Immigration and Customs Enforcement Undercover Agent and Immigration and Customs Enforcement Cooperating Witness informed the defendant that they are involved in various illegal activities to include counterfeit cigarettes, the sale of counterfeit goods, and the sale of stolen property. The Immigration and Customs Enforcement Undercover Agent informed the defendant on approximately 2 occasions, that their (ICE UCA and ICE CW) main client is Hizballah, and they (ICE UCA and ICE CW) need to get the money ($60,000.00) overseas to Hizballah to help rebuild Hizballah schools and bases.[1] The Immigration and Customs Enforcement

---

[1] Under Title 18, United States Code, Section 2339B it is unlawful to provide "material support or resources" to an organization the Secretary of State has designated as a "Foreign Terrorist Organization." The Secretary of State designates Foreign Terrorist Organizations (FTO's), in consultation with the Attorney General and the Secretary of the Treasury. These designations are undertaken pursuant to the Immigration and Nationality Act (INA), as amended by the Antiterrorism and Effective Death Penalty Act of 1996. On October 8, 1997, the Department of State designated Hizballah as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, as added by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 302, 110 Stat. 1214, 1248 (1996), as amended by the Illegal Immigration Reform and

Undercover Agent explained to the defendant that Hizballah operatives in the United States provide them (ICE UCA and ICE CW) with the stolen merchandise.  The Immigration and Customs Enforcement Undercover Agent and Immigration and Customs Enforcement Cooperating Witness then sell the merchandise at a considerable profit and after taking their cut, send the remaining amount back to Hizballah in Lebanon.

The defendant was told by the Immigration Customs Enforcement Undercover Agent that if the guys of Hizballah in Beirut were happy, the defendant would get a bonus and the Immigration and Customs Enforcement Cooperating Witness told the defendant there would be more business on a monthly basis, not just a one time thing.  The Immigration and Customs Enforcement Cooperating Witness stated that he would meet the defendant every month for 5-10 minutes and hand the defendant the money and leave.  The defendant stated he could move $20,000.00 per week.

At this meeting, the defendant took possession of the $60,000.00 and agreed to transfer the money for a 6% fee.  The Immigration and Customs Enforcement Cooperating Witness and Immigration and Customs Enforcement Undercover Agent offered the defendant a bonus if he transferred the money directly to their bank in Bahrain, rather than going through the defendant's contact in Yemen and then to Bahrain.  The defendant indicated he would consider this request.  The Immigration and Customs Enforcement Cooperating Witness provided the defendant the bank name, account

---

Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996).  62 Fed. Reg. 52,650 (1997). Hizballah has been continuously designated since that date.

6

1  number and swift code for the undercover account in Bahrain.  The
2  defendant provided his fax number to the Immigration and Customs
3  Enforcement Cooperating Witness (559) 992-3861, which is the
4  business telephone number for the Ranchito Market.  The meeting
5  concluded and the defendant took the $60,000.00 that had been
6  placed in a "GAP" bag and left the hotel.  A surveillance team
7  then followed the defendant back to his business/residence,
8  located at 2749 Whitley Avenue, Corcoran, California.
9       On November 13, 2006, the Immigration and Customs Enforcement
10 Cooperating Witness received a phone call from the defendant in
11 California.  The call was consensually monitored and recorded and
12 the defendant informed the Immigration and Customs Enforcement
13 Cooperating Witness that the defendant would send the money
14 directly to the bank in Bahrain, but wanted to be paid 10% of the
15 amount being sent.  The Immigration and Customs Enforcement
16 Cooperating Witness informed the defendant he would check with his
17 partner (ICE UCA) and get back to him.  On or about November 15,
18 2006, the Immigration and Customs Enforcement Cooperating Witness
19 placed a consensually monitored phone call to the defendant and
20 informed the defendant that he had spoken with his partner (ICE
21 UCA) and they were willing to pay him a 10% fee to send the money
22 directly to Bahrain.  The defendant informed the Cooperating
23 Witness he intended to send approximately $25,000.00 in the next
24 day or so to Bahrain.
25      On or about November 22 and 28, 2006, deposits were received
26 in the Immigration and Customs Enforcement undercover bank account
27 in Bahrain from an account controlled by the defendant in the
28 amount of $24,988.00 and $29,990.00, respectively.  As of November

28, 2006, the Immigration and Customs Enforcement undercover bank account in Bahrain had received a total of $54,978.00 from the original $60,000.00 given to the defendant to transfer overseas for Hizballah.  The defendant retained $5,022.00 for his transaction fee.

On February 18, 2007, a second joint undercover operation with the defendant took place in Room 123 of the Piccadilly Inn, located at 5115 East McKinley Avenue, Fresno, California.  The consensually monitored meeting (audio and video) involved the defendant, an Immigration and Customs Enforcement Undercover Agent, an Immigration and Customs Enforcement Cooperating Witness and a FBI Cooperating Witness.  During the meeting, the Immigration and Customs Enforcement Undercover Agent and Immigration and Customs Enforcement Cooperating Witness again informed the defendant that they are involved in various illegal activities.  The Immigration and Customs Enforcement Undercover Agent and Immigration and Customs Enforcement Cooperating Witness again represented they had ties to Hizballah and requested the defendant help facilitate the movement of $80,000.00 in United States currency overseas to assist Hizballah with purchasing weapons and uniforms.  The defendant agreed to assist them and to wire transfer the money to the same Immigration and Customs Enforcement undercover bank account in Bahrain.  The meeting concluded and the defendant took the $80,000.00 that had been placed in a brown paper grocery bag with paper handles and left the hotel.  During this meeting the Immigration and Customs Enforcement Undercover Agent told the defendant that people in Beirut, Lebanon, were very happy and impressed with his attitude

(Muthana).  The Immigration and Customs Enforcement Undercover Agent said his guy Samir in Lebanon had said that they needed a lot of money moved over to Lebanon to buy weapons and uniforms and he (Samir) promised to give a bonus if he (Muthana) could increase the flow of money.  The defendant said he preferred to transfer money through Bahrain and the defendant could not move more than $25,000.00 dollars a week.  The Immigration and Customs Enforcement Undercover Agent told the defendant that Samir, the Hizballah guy in Beirut, trusted the defendant and that he (Samir) was happy the money was from the defendant.  This money was never transferred because the defendant was subsequently arrested due to the fact that the case was taken down earlier than expected due to the fact that one of the Buffalo co-conspirators was planning on leaving the country.

**PROCEDURAL HISTORY**

On September 28, 2006,  the defendant was charged by indictment with four counts of Money Laundering in violation of Title 18, United States Code, Section 1956(a)(3).  The maximum penalties associated with these offenses are twenty (20) years imprisonment.  According to the indictment, the defendant laundered money on four separate occasions for a total over $209,000 from the period of September to December 2005.

On or about February 26, 2007, the defendant was arrested on the charges.  On that same date search warrants ere executed at locations controlled by the defendant.  Simultaneously with the execution of the search warrants, ten seizure warrants were executed on the defendant's various back accounts and locations and over $225,000 was seized by the United States as a result of

these warrants.  The defendant made his initial appearance before the magistrate judge on February 27, 2007.  At the hearing, the government requested the defendant's detention.  The matter was continued for detention hearing to February 28, 2007.  On that continued date, the matter was again continued to March 5, 2007 and again at the request of the defendant.  On March 6, it was continued one more time at the defendant's request to March 6, 2007, before the Honorable Dennis L. Beck.

At the detention hearing on March 6, 2007, the court heard the proffer of the parties.  In consideration of detention, the government requested a review of the search warrant in the case,[2] proffered evidence as to this defendant's ties overseas, his operation of an illegal international money transmitting business and the fact that the defendant was an unindicted co-conspirator with others out of the Western District of New York for similar money laundering activities.[3]  The defendant requests that he be released based upon the property being posted by another person, his property and his ties to this community.  The government then countered that the during the course of a search warrant conducted on the defendant's business and residence, agents found a Saudi Arabian driver's license with the defendant's picture on it but in a name different than the defendant's present name.[4]  The name was also never provided to the pre-trial services officer.  The pre-trial services officer recommended detention.  After hearing the

---

[2] Attached as Exhibit 1.

[3] Attached as Exhibit 2.

[4] Attached as Exhibit 3.

evidence, the magistrate judge ordered the defendant detained as a flight risk because the court found by a preponderance of the evidence that there existed no condition or combination of conditions which would reasonably assure the defendant's appearance.  <u>See</u> Detention Order filed March 7, 2007.

This finding was based upon the fact that the defendant was charged with a serious crime of money laundering carrying twenty (20) years imprisonment on each count, the defendant had minimal family ties to the community, he did not seem to have significant community ties, his past conduct including his social history and personal information was unverified and his property was subject to forfeiture, the defendant is a legal alien who will be subject to deportation if convicted, he is a citizen of Yemen and has substantial family ties to Yemen and Morocco and has traveled to those countries in the past two years.  <u>Id</u>.

On March 16, 2007, the defendant appealed this order in the form of a Motion for Reconsideration.  In its two page motion, the defendant argued that the government bears the burden by preponderance of the evidence to prove that the defendant is a flight risk.  The government agrees with this statement of law but disagrees with the defendant's conclusion that the government failed to meet this burden.  On April 23, 2007, the defendant filed a supplemental memorandum concerning why this defendant should be released.

In assessing this evidence, the government requests that this court review the search warrant affidavit submitted in this case and the criminal complaint out of the Western District of New York.

**ARGUMENT**

**A.   Standard of Review.**

The district court may review the release order of the magistrate upon the government's filing of a motion for revocation of the release order.  18 U.S.C. § 3145(a).  The district court is required to review the magistrate's order de novo.  United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990).  The ultimate determination of the propriety of detention is to be decided without deference to the magistrate's ultimate conclusion.  Id.

**B.   Bail Reform Act.**

The detention and release of a defendant is governed by the Bail Reform Act of 1984, 18 U.S.C. § 3141, et seq.  In order to request that a defendant be detained, the government must be the strictures of the Section 3142(f)(1) and (2).  Here, the government moved that the defendant he detained  In order to detain as a flight risk, the government bears the burden of proving by a preponderance of the evidence that the defendant is a flight risk.  United States v. Motamedi, 767 F.2d 1403 (9th Cir. 1985).  In ascertaining whether to detain or release a defendant, a court determines whether or not there are conditions which can reasonably assure a defendant's appearance.  18 U.S.C. § 3142(f).  Section 3142(g) of Title 18 governs the factors which the court must consider in determining issues regarding release/detention.  The section states:

> The judicial officer shall, in determining whether these are conditions of release that will reasonably assure the appearance of the person as required and the safety of the community, take into account the available information concerning-
> (1)   the nature and circumstances of the offense charged, including whether the offense is a

```
                    crime of violence or involves a narcotic drug;
          (2)   the weight of the evidence against the person;
          (3)   the history and characteristics of the person,
                including-
                (A)   the person's character, physical and
                      mental condition, family ties,
                      employment, financial resources,
                      length of residence in the
                      community, community ties, past
                      conduct, history relating to drug or
                      alcohol abuse, criminal history, and
                      record concerning appearance at
                      court proceedings; and
                (B)   whether, at the time of the current
                      offense or arrest, the person was on
                      probation, on parole, or on other
                      release pending trial, sentencing,
                      appeal, or completion of sentence
                      for an offense under Federal, State,
                      or local law,
          (4)   the nature and seriousness of the danger to
                any person or the community that would be
                posed by the person's release. . . .
```

In this case, there is no condition or conditions of conditions which will reasonably assure this defendant's appearance.

**C.  Merits of Detention Order.**

In this case, applying the factors as set forth under the Bail Reform Act of 1984, the defendant's ability to travel to the Middle East and Northern Africa, his ties to those areas, the crimes for which he is charged and his subject to deportation if he is convicted do not reasonable assure the defendant's appearances.  18 U.S.C. § 3142(e).  Additionally, the additional charges this defendant is looking at in addition to those he is presently charged all favor detention of this defendant. For the following reasons, the Magistrate Judge's order of detention was proper.

### 1. The Nature and Circumstances of the Crime and Seriousness

As previously noted, the defendant is charged with four counts of money laundering involving approximately $209,000. The maximum penalty under the statute is on each is twenty (20) years imprisonment.

The defendant asserts that the guideline range is relatively low and hence this defendant has no incentive to flee. However, his guideline calculation is not accurate as calculated because the defendant gives himself acceptance and yet contends he is innocent of the offenses and will fight the matter to clear his name. Therefore, this calculation is misleading. Further, this guideline exposure does not take into account that the defendant can be sentenced up to twenty years and does not take into account the exposure he will be subject to in the Western District of New York case or exposure he may face if additional charges are brought against him in this district.[5] Lastly, the United States does not accept an Alford plea in federal court and therefore this

---

[5] While the defendant is not presently charged with those crimes and may not carry much weight with the court they are entitled to some weight, however slight, and are probative of an intent to flee the jurisdiction. The Assistant United States Attorney assigned to the case in the Western District of New York has informed our office that this defendant will charged in his district for at least a conspiracy to launder money. He also informed our office that this defendant, Abdulla Kasem Ahmed Muthana, is the "California connection" referred to in his criminal complaint. See Exhibit 2, pg. 22-23 ("California contact") As for future charges in this district the United States is still continuing its investigation on this aspect and therefore cannot represent that the defendant will be charged as the Western district of New York can. However, there is the potential that the defendant could be charged and charged with more serious offenses.

means of plea is unavailable to the defendant for the United States will not accept such a plea nor does Fed.R.Crim.P. 11 seem to accept such a form of plea.

This factor is probative under Section 3142(g)(1) and is a factor which favors the defendant's detention.

**2.   Weight of the Evidence.**

Here, the defendant was involved in four separate transactions involving the laundering of $209,000 in what the defendant believed were fraudulent unemployment insurance checks. He took those checks and deposited the checks, 352 of them, into his bank account and took a cut of the proceeds. Many of the transactions were conducted with an undercover agent. While the government recognizes that the Ninth Circuit has held that this factor should be given the least amount of weight,[6] it is, nevertheless, a factor which this court cannot ignore. In light of defendant's conduct, together with subsequent evidence of his willingness to transfer money for Hizballah shows this defendant's propensity to commit these crimes based upon pure greed.

The defendant attempts to counter that the government committed outrageous government conduct and entrapment. As to the outrageous government conduct, the defendant has failed to articulate by what basis this "outrageous government conduct" occurred. Use of the word "outrageous government conduct" is merely rhetorical without foundation and therefore should not be considered at the detention hearing.

As to the entrapment of the defendant, the defendant again

---

[6] United States v. Motamedi, 767 F.2d 1403 (9th Cir. 1985).

15

does not articulate how this occurred with regard to the defendant.  However, the quintessential aspect of entrapment is a defendant's pre-disposition to commit the crimes.  Here, his continuous laundering of what he believed were illegal proceeds both with these charges and his subsequent conduct regarding the Hizballah transactions shows his knowledge of laundering aspects,[7] and his ready willingness to commit the crime and to commit the crime of multiple occasions.  Additionally, the fact that individuals in Buffalo, New York were aware that this defendant could move large sums of money overseas is also probative of his pre-disposition.  All aspects negate any entrapment defendant he may have.  Therefore, this defense, while it may be presented at trial, does not lessen the charges against this defendant.

This factor is probative under Section 3142(g)(2) and is a factor which favors the defendant's detention.

**3.   Defendant's Prior Criminal History.**

The defendant has a minor prior criminal history.  He has a 1997 misdemeanor conviction for furnishing tobacco products to minors.

**4.   Defendant's Ties to the Community.**

The defendant's ties to this district while somewhat lengthy are not necessarily strong.  The defendant has extensive ties overseas, including his second wife who lives in Morocco and children and other family members who reside in the Middle East, including Yemen and Saudi Arabia.  In addition to the family ties

---

[7] These include structuring the transactions, placing fraudulent identification on the cards such as fingerprints and driver's license numbers to make the transactions appear legitimate.

overseas, the defendant sends hundreds of thousands of dollars overseas and therefore has connections with these individuals and has had ready access to large amounts of cash which could be used to pay off any bond he defaults on.  On the day of arrest  While the defendant contends that he is an overseas international money remitting business, the money sent overseas to the Middle East was not sent as an agent of the money remitting business for which he is an agent but was sent through a regular wire transfer.

Additionally, in his supplemental memorandum the defendant cites authority for the proposition that because the government did not move for detention under Section 3142(d), Title 18, United States Code that it is foreclosed from raising issues relating to the deportation consequences of a conviction on these charges.  See Supplemental memorandum filed April 23, 2007 at page 5.  First, this particular section is simply inapplicable since the government is not seeking to acquire a ten (10) day detention under that subsection but instead is seeking to detain this defendant pending trial on this matter.  Therefore, its application is simply inapplicable.  Second, the issue of defendant's deportation is clearly probative of this defendant's flight.  If convicted of these offenses there is not much of an incentive for this defendant to stay around since he will do imprisonment and will be subject to deportation.  He will be subject to deportation because a conviction for money laundering as charged in this case is an aggravated felony which requires deportation.[8]  See 8 U.S.C. § 1101(a)(43)(D).  The defendant cites

---

[8] (43) "The term 'aggravated felony' means- . . . (D)an offense described in section 1956 of Title 18 (relating to

a number of deportation related cases but none of those cases hold that the defendant is not subject to deportation if convicted of an aggravated felony. The defendant's cases discuss general a application which have no bearing on the facts of defendant's case. <u>See</u> Supplement pages 5-6. Thus, the defendant faces the prospect not only of prison, but of deportation even after he has served his sentence. This is a large incentive for him to flee for neither will result if he flees the jurisdiction of this court.

Lastly, the defendant's self-serving statements are not probative that he will remain and make all his court appearances. Additionally, the psychologist report of Doctor Richard Blak is also of little value since he does not appear to be an expert in the area of "low flight risk." At least one judicial officer, who has more experience in this arena than Dr. Blak, made a contrary finding and nothing in this report changes any of those findings by the magistrate judge.

Accordingly, the flight risk is very high in this case and the magistrate judge correctly found when he ordered the defendant detained.

**5. Additional Factors Probative of Flight Risk.**

Here, two additional factors must be then into account by the is court in reviewing the detention order. First, the defendant is looking at additional charges out of the Western District of New York related to his activities of conspiracy to money

---

laundering of monetary instruments) or section 1957 of that title (relating to engaging in monetary transactions in property derived from specific unlawful activity) if the amount of the funds exceeded $10,000. . . ."

laundering with those individuals out in that district. This is separate money laundering charge and presently not related to the charges of the defendant in this district.

Second, he may be subject to other charges in this district, including attempted material support for terrorist activities and/or money laundering related to his conduct occurring from November 2006 to February 2007 in which he laundered and attempted to launder illegally acquired proceeds which be believed were being used to support Hizballah, a terrorist organization. Both of these additional aspects is probative of this defendant's flight risk and is a factor which favors detention.

Also, the defendant uses another name which he has yet to address and did not address at the detention hearing. See Exhibit 3.

All these factors favor detention of this defendant.

## **CONCLUSION**

Simply put the government has show by a preponderance of the evidence that the defendant is a flight risk and should be detained as such. Therefore, the magistrate judge did not err in detaining this defendant as a flight risk.

Respectfully submitted,

McGREGOR W. SCOTT
United States Attorney

DATED: 4/27/07          By     /s/ Stanley A. Boone
                               STANLEY A. BOONE
                               Assistant U.S. Attorney