# United States District Court

## *EASTERN DISTRICT OF CALIFORNIA*

ORIGINAL FILED

FEB 2 3 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

*In the Matter of the Search of*

**2749 WHITLEY AVENUE,
CORCORAN, CALIFORNIA**

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

### CASE NUMBER  07 M 0 0 0

I, the undersigned affiant, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. I am a duly appointed Task Force Officer with the Federal Bureau of Investigation (FBI), Joint Terrorism Task Force (JTTF), Sacramento Division, Fresno Resident Agency Special Agent with the Federal Bureau of Investigation, and have reason to believe that on the premises described in Attachment A and incorporated by reference herein, in the Eastern District of California, there is now concealed certain property, described in Attachment B and incorporated by reference herein, which constitutes evidence, fruits, or instrumentalities of crimes in violation of 18 U.S.C. §§ 1341, 1956, 2339B, 2339C, 1960(a)(1)(C) and 2342 (a) and 2.

The facts to support the issuance of a search warrant are contained in the attached Affidavit of Brad L. Lehr, incorporated by reference herein.

_____

Brad L. Lehr, Task Force Officer with the
Federal Bureau of Investigation

*Sworn to before me, and subscribed in my presence at Fresno, California*

*this* 24th *day of* ___February___ *, 2007, at* ___Fresno, Calif___

_____

LAWRENCE J. O'NEILL
United States District Judge

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Brad L. Lehr, a duly appointed Task Force Officer with the Federal Bureau of Investigation (FBI), Joint Terrorism Task Force (JTTF), Sacramento Division, Fresno Resident Agency, being duly sworn depose and state as follows to wit:

### INTRODUCTION

1.      I am a California Highway Patrol Investigator presently assigned as a JTTF Officer with the Federal Bureau of Investigation (FBI), and I have been so assigned to this position for approximately four and a half years. I have been a California law enforcement officer for twenty years, and I am currently a deputized federal law enforcement officer and, as such, I have been empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18 of the United States Code. As part of my duties, I have investigated and/or assisted with cases that involve possible terrorist connections and white collar criminal matters, to include mail fraud, wire fraud, money laundering, illegal money transmitting, contraband or counterfeit cigarettes, fraudulent cigarette tax stamps, and fraud against the government.

2.      The facts in support of this affidavit and contained in the following paragraphs, are the result of an investigation concerning Abdulla Qassem Ahmed Muthana, also known as Abdulla Qassem Ahmed, and his involvement in the promotion of laundering checks represented to be fraudulent State of California Employment Development Department (EDD) unemployment checks that had been sent through the United States mail; facilitating the movement overseas to Bahrain of United States currency represented as being transmitted to Hizballah, a designated terrorist organization, and for the purchase of contraband Marlboro

1

cigarettes and associated fraudulent California cigarette tax stamps, in violation of United States law.

3.   I make this affidavit based in part on personal knowledge gathered during my participation in this investigation, and in part, upon information and belief. Since this affidavit is being submitted for the limited purpose of seeking authorization for a warrant to search the described locations, I have not set forth every fact learned during the course of the investigation. Facts not set forth herein are not being relied upon in reaching my conclusion that such warrants should be issued. Nor do I request that this Court rely upon any facts not set forth herein in reviewing this application for search and arrest warrants. The sources of my information and beliefs are:

a)   Personal experience, background and training;

b)   Personal review of records and documents;

c)   Independent investigation by information provided by other Special Agents (SA) of the FBI, Immigration and Customs Enforcement (ICE), Bureau of Alcohol, Tobacco and Firearms (ATF), state and local law enforcement officers and their reports;

d)   Consultation with other business entities representatives;

e)   independent investigation, surveillance and undercover operations conducted by the FBI and the JTTF;

f)   contraband Marlboro cigarettes and fraudulent California cigarette tax stamps provided by ATF agents;

g)   personal review of records and documents subpoenaed from the Bank of the West.

## CRIMINAL VIOLATIONS

4.   This affidavit is made in support of an application for search warrants regarding

the locations described in Attachment A hereto and to search for and seize property as described

in Attachment B, that constitutes evidence of the commission of a criminal offense, and

contraband, the fruits of crime, and things otherwise criminally possessed and property designed

or intended for use or which is or has been used as the means of committing a criminal offense

which constitutes violation of law under one or more of:

> Title 18, United States Code, Section 1341 (Mail Fraud)

> Title 18, United States Code, Section 1956
> (Money Laundering)

> Title 18, United States Code, Section 2339B
> (Providing Material Support)

> Title 18, United States Code, Section 2339C
> (Financing Terrorism)

> Title 18, United States Code, Section 1960 (a)(1)(C)
> (Unlicensed Money Transmitting)

> Title 18, United States Code, Section 2342 (a)
> (Purchasing Contraband Cigarettes)

### AREAS TO BE SEARCHED

5.     The evidence sought by the search warrant is primarily of a documentary nature,

and includes handwritten records and documents in English, Arabic and/or other foreign

writings, as well as computer generated records, computer hardware and software, delivered

mail, cash, and other such documents as more fully described as items to be seized in Attachment

B hereto, relating to the operation and illegal activities of the criminal violations disclosed above.

This affidavit is made in support of a search warrant for the locations described as follows:

> **2749 Whitley Avenue, Corcoran, California,** is described as the Ranchito
> Market, a small convenience store with an attached single family residence

3

located on the western outskirts of Corcoran, California. The convenience store is located on the south side of Whitley Avenue east of James Avenue and is further described as constructed of blocklite brick facade painted white with a light grey composite shingle roof. The address of 2749 in affixed to the building just above the front glass entry doors of the store and are black in color, approximately 4" high. A large white sign with the name "Ranchito Market" in large red letters is attached to the building above the store entrance, along with a large pole sign west of the entrance with the name of the Ranchito Market. East of the store's main entrance is a second entry with a white security door and a single car aluminum garage door is on the far east side of the building. The single-family residence is physically attached to the store and is described as a single story, salmon colored stucco home with blue wood trim and a light grey composite shingle roof. The residence faces west and the front door is enclosed by a black metal security door. The location also has a blue colored outbuilding with a brown composite roof on the south side of the residence.

**2838 Waukena Drive, Tulare, California**, is described as the Ranchito Market #2, a small convenience store located in rural Tulare County east of Corcoran, California. The convenience store is on the north side of Waukena Drive west of Stevenson Drive and is further described as constructed primarily of slatted wood siding. The front of the building is blue in color and the south and east sides are painted white with a brown composite shingle roof. The south side of the structure is constructed of metal framing and glass, with stone veneer on the lower half. The front door of the business faces south and the numbers 2838, in black, are attached vertically to the building on the west side of the front door. There is a black, sliding security fence attached to the south side of the building. A white sign, west of the store's entrance, is attached to a white pole and reads "Ranchito Market #2" in red letters.

6.      These searches should include all rooms, annexes, attics, basements, garages, carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage lockers and areas, cabinets, rooms, sheds and outbuildings associated with these premises. The search should also extend into desks, cabinets, safes, briefcases, purses, trash receptacles, electronic storage devices, and other storage locations within the premises; to include the search of any computer base storage media contained within the premises and any other storage locations within the premises in which items in Attachment B may be found. It has been my experience that suspects in similar investigations possess storage safes, computers, cell phones and pagers and use them

4

as part of their method of operation.  I have found and recovered these types of items at such locations in the past investigations.

7.     I request that the search of these locations authorize officers conducting the search to require the production of identification of any person reasonably believed by the officers to have possession and control of the premises.  Each search should also authorize officers to search the persons and items attached to them (such as purses, backpacks, etc.) encountered at the various search locations, whether they are located indoors, outdoors or in an automobile.

8.     I also request that the search include any and all vehicles at these locations, which are found within the locations and/or the curtilage of the locations.  It has been my experience that suspects in this type of investigation transport items, property and contraband via their vehicles and store them inside of said vehicles.  I have familiarity with past investigations in which documents have been found in automobiles from suspects' vehicles.  It has also been my experience that these vehicles are not necessarily registered to the person who has control over the vehicle.

9.     I believe that probable cause exists that evidence, fruits, instrumentalities, documents, and other paraphernalia more fully described in Attachment B hereto and incorporated herein by reference are located at the locations described in Attachment A, and they will tend to establish violations of Title 18, United States Code (U.S.C.), Sections 1341, 1956, 2339B, 2339C, 1960(a)(1)(C) and 2342 (a).

## **FACTS ESTABLISHING PROBABLE CAUSE**

10.     The Fresno FBI has been investigating the business activities of Abdulla Qassem Ahmed Muthana ("Muthana"), also known as Abdulla Qassem Ahmed since May of 2004.

5

Muthana is the owner of record for the Ranchito Market, 2749 Whitley Avenue, Corcoran,

California, and the Ranchito Market II, 2838 Waukena Drive, Tulare, California. A Confidential

Witness (CW) provided information regarding Muthana's numerous criminal activities, to

include knowingly cashing fraudulent EDD benefit checks for a fee. In March 2005, the Fresno

JTTF initiated a check sting/money laundering operation focused on Abdulla Muthana.

11.     Muthana was born in Yemen and is a native and citizen of Yemen.

1.     EDD Fraud

12.     The Social Security Act of 1935 (the "Act") initiated the Federal and State

Unemployment insurance system, which is designed to provide benefits to persons out of work

through no fault of their own. The purpose of the Act is to lessen the effects of unemployment

through payments made directly to laid-off workers, insuring that at least a significant portion of

the necessities of life, most notably food, shelter, and clothing, can be met on a weekly basis

while the worker seeks employment. The unemployment insurance (UI) program is administered

for the federal government by the State Workforce Agencies in each State. In California, the

state agency is the California Employment Development Department (EDD).

13.     During an undercover law enforcement operation, it was represented to Muthana

that the EDD checks had been obtained from the State of California through fraudulent means

and had been transmitted through the United States Mail. Muthana agreed to promote the

fraudulent scheme, and conceal the proceeds thereof, by receiving the EDD checks, depositing

them into the Ranchito Market checking account at the Bank of the West, and then delivering

cash to the persons who represented the checks as fraudulent and identified themselves as the

perpetrators of the fraud. For this service, Muthana demanded and received a cash commission

6

payment for each transaction he performed involving an EDD check.

14.     Between September 28, 2005, and January 12, 2006, Muthana received a total of 324 EDD checks with a face value totaling $209,130.00 from a law enforcement officer and a person acting at the direction, and with the approval of a law enforcement officer. For the service of exchanging cash for these checks, Muthana demanded and received a total payment of $16, 940.00. Muthana received approximately 8.1 % of the total amount laundered for this service.

15.     Through a series of consensually recorded conversations with the Cooperating Witness, Muthana agreed to cash what he believed to be unlawfully obtained State of California unemployment checks for a negotiated fee. Through an agreement established with the United States Department of Labor (DOL) and the California EDD, FBI/JTTF agents were provided with valid EDD checks to be used for the operation.

16.     United States Department of Labor Special Agent (SA) Jesse Quezada created a database of fictitious payees and generated valid unemployment checks through the State of California Employment Development Department for the operation. JTTF Officer Brad Lehr generated twenty-five (25) fictitious California Drivers License numbers (CDL) that were randomly placed on the 324 EDD checks used during the operation.

17.     On September 28, 2005, a State of California Department of Justice agent, acting in an undercover capacity (UCA), posed as the producer of the EDD checks and provided the initial batch of fifty-eight (58) checks to Muthana, totaling $36,984.00. Muthana agreed to cash the checks for a fee of $50.00 per check and subsequently cashed them through a series of deposits into the Ranchito Market business account.

7

18.     The fifty-eight (58) checks were deposited into the Ranchito Market business account held at the Bank of the West, account number 706-025970, on the following dates: September 29, 2005, 14 checks; September 30, 2005, 12 checks; October 3, 2005, 16 checks; October 5, 2005, 8 checks; October 7, 2005, 4 checks; and October 11, 2005, 4 checks.

19.     During the first meeting, which was a consensually monitored conversation, the Undercover Agent advised Muthana that his checks were "right off the factory" and tells Muthana that he (UCA) has a relative that works on the inside. The Undercover Agent explained to Muthana not to cash too many checks per day because the banks will start to ask questions. Muthana replied, "Oh yeah, yeah, no, I have to take care of my business too." The Undercover Agent advises Muthana to mix the checks in with his regular business checks so that there is no suspicion, and Muthana agreed.

20.     The Undercover Agent stated he was told that Muthana wanted drivers license numbers and signatures on each check and Muthana replied, "Yeah, yeah, the deal was, but now they need the fingerprint." Muthana advises he needed them (fingerprints) for the bank so that there were no problems. The Cooperating Witness advised the Undercover Agent that the Cooperating Witness had previously explained to Muthana that for the first batch of checks they (CW and Muthana) would handle the fingerprints themselves. It was then agreed to that for the future checks, fingerprints would be provided by the Undercover Agent.

21.     The Undercover Agent asked Muthana if he could handle large amounts of checks every two weeks. Muthana said yes, but indicated that he could only put them through the bank in small numbers per day. The Undercover Agent informed Muthana that the relative working inside mails the checks out every two weeks and his nephew (JTTF Agent) picked the checks up

8

at various post office boxes. Muthana advised that he could handle the checks, but reiterates that he would need fingerprints on all future checks. The Undercover Agent discussed that they needed to have trust in one another and Muthana replied, "We have to stick together." The Undercover Agent advised Muthana that if the cops ever came and ask about the checks, Muthana was only to reply that he (Muthana) checked for licenses and signatures and that he had done his part.

22.    On October 4, 2005, during a consensually monitored conversation, the Cooperating Witness advised Muthana that he had talked to his friend (JTTF Agent) about being paid more money for cashing the EDD checks. The Cooperating Witness stated he told the friend (JTTF Agent) that Muthana had previously cashed checks for guys in Selma, California, for a fee of $25.00 per check, and that the checks were in smaller amounts. Muthana agreed that the checks were smaller and added that it was a long time ago and now he (Muthana) was being charged more by the bank. The Cooperating Witness stated that the friend (JTTF Agent) had talked to his uncle (UCA), and he (UCA) was unwilling to pay more for cashing the checks.

23.    The Cooperating Witness informed Muthana that the Undercover Agent had told his friend (JTTF Agent) that the money made from the checks had to be split between many people. The Undercover Agent also had to pay off the girl working in the office who made the checks, the guys who picked up the checks, and people to sign and place fingerprints on the checks. The Undercover Agent had told the CW's friend (JTTF Agent) that he (UCA) could not pay more unless they (Muthana and the CW) were willing to do more of the work. Muthana asked the Cooperating Witness what kind of work they could do and the Cooperating Witness advised that maybe they could pick up the checks, sign them and/or place fingerprints on them.

9

Muthana told the Cooperating Witness that if they were going to do all that work, he (Muthana) would want $150.00 per check. Muthana also questioned how they (Muthana and the CW) would pick up the checks and the Cooperating Witness stated that maybe the friend (JTTF Agent) would give them the post office box keys. Muthana stated that placing signatures and fingerprints on the checks would be dangerous and could cause too many problems. Muthana advised that when he had placed his fingerprints on the checks a couple of days prior, he (Muthana) was scared. Muthana thought more about the issue and finally stated, "Just see if you can get them to pay $65.00 per check."

24.     On October 12, 2005, Fresno JTTF Special Agent Frank Navarro, Special Agent Gerald Menoni, and EDD Criminal Investigator Antonio Cabrera Jr. met with the Cooperating Witness, in Corcoran, California, to recover the balance from the check cashing transaction. The Cooperating Witness arrived at the meeting location carrying a black plastic bag which he/she advised contained $34,084.00 in cash. The Cooperating Witness advised that Muthana kept $2,900.00 as his fee for cashing the checks. The money was removed from the bag, counted in the presence of the above agents and the total amount was confirmed.

25.     On November 15, 2005, United State Department of Labor Special Agent Jesse Quezada provided JTTF Special Agent Frank Navarro with one hundred and eight (108)EDD checks. JTTF Special Agent Navarro, with the assistance of FBI Special Agent Gerald Menoni, FBI Special Agent Glen Bartolomei, FBI Special Agent Jacqueline Neumann and JTTF Detective Sheila Chandler signed each of the checks in the respective payee's names, placed fingerprints, and previously obtained CDL identification numbers on the face of each check.

26.     On November 16, 2005, the Cooperating Witness provided Muthana with the

10

second batch of one hundred and eight (108) EDD checks, totaling $69,980.00. Muthana again agreed to cash the checks for a fee of $50.00 per check and subsequently cashed them through a series of deposits into the Ranchito Market business account.

27.     The one hundred and eight (108) checks were deposited into the Ranchito Market business account held at the Bank of the West, account number 706-025970, on the following dates: November 17, 2005, 20 checks; November 21, 2005, 25 checks; November 23, 2005, 8 checks; November 25, 2005, 22 checks; November 28, 2005, 15 checks; December 1, 2005, 10 checks; and December 2, 2005, 8 checks.

28.     On December 8, 2005, Fresno JTTF Special Agent Frank Navarro, Special Agent Gerald Menoni, EDD Criminal Investigator Antonio Cabrera Jr. and United States Department of Labor Special Agent Jesse Quezada met with the Cooperating Witness in Tulare, California, in order to recover the balance from the check cashing transaction. The Cooperating Witness arrived at the meeting location in possession of a white plastic bag which contained $64,580.00 in cash. The Cooperating Witness advised that Muthana kept $5,400.00 as his fee for cashing the checks. The money was removed from the bag, counted in the presence of the above agents and the total amount was confirmed.

29.     On December 9, 2005, United States Department of Labor Special Agent Jesse Quezada provided JTTF Special Agent Frank Navarro with eighty-four (84) EDD checks. JTTF Special Agent Frank Navarro, with the assistance of FBI Special Agent Gerald Menoni, Department of Labor Special Agent Jesse Quezada and EDD Criminal Investigator Antonio Cabrera Jr. signed each of the checks in the respective payee's names, placed fingerprints, and previously obtained CDL identification numbers on the face of each check.

11

30.    On December 9, 2005, the Cooperating Witness provided Muthana with the third

batch of eighty-four (84) EDD checks, totaling $53,430.00.  Muthana agreed to continue to cash

the checks for a fee of $50.00 per check and subsequently cashed them through a series of

deposits into the Ranchito market business account.

31.    Sixty-nine (69) of the eighty-four (84) checks were deposited into the Ranchito

Market business account held at the Bank of the West, account number 706-025970, prior to the

fourth and final batch of EDD checks delivered on December 22, 2005.  The sixty-nine (69)

checks were deposited on the following dates:  December 10, 2005, 1 check; December 12, 2005,

10 checks; December 14, 2005, 11 checks; December 16, 2005, 10 checks; December 19, 2005,

19 checks; and December 22 2005, 13 checks.

32.    On December 22, 2005, Fresno JTTF Special Agent Frank Navarro, EDD

Criminal Investigator Antonio Cabrera Jr. and United States Department of Labor Special Agent

Jesse Quezada met with the Cooperating Witness in Corcoran, California, to recover the balance

from the check cashing transaction.  The Cooperating Witness arrived at the meeting location in

possession of a white plastic bag which contained $49,230.00 in cash.  The Cooperating Witness

advised that Muthana kept $4,200.00 as his fee for cashing the checks.  The money was removed

from the bag, counted in the presence of the above agents and the total amount was confirmed.

33.    On December 22, 2005, United States Department of Labor Special Agent Jesse

Quezada provided JTTF Special Agent Frank Navarro with the final group of seventy-four (74)

EDD checks.  JTTF Special Agent Frank Navarro, with the assistance of Special Agent Jesse

Quezada and EDD Criminal Investigator Antonio Cabrera Jr. signed each of the checks in the

respective payee's names, placed fingerprints, and previously obtained CDL identification

12

numbers on the face of each check.

34.    December 22, 2005, the Cooperating Witness provided Muthana with the fourth and final batch of seventy-four (74) EDD checks, totaling $48,736.00. Muthana agreed to cash the checks for an increased fee of $60.00 per check and subsequently cashed them through a series of deposits into the Ranchito Market business account.

35.    The remaining eighty-nine (89) were deposited into the Ranchito Market business account held at the Bank of the West, account number 706-025970, on the following dates: December 23, 2005, 10 checks; December 27, 2005, 19 checks; December 30, 2005, 20 checks; January 3, 2006, 20 checks; January 5, 2006, 10 checks; January 8, 2006, 1 check; and January 9, 2006, 9 checks.

36.    On January 12, 2006, Fresno JTTF coordinated a consensually monitored meeting between Muthana, the Cooperating Witness and the Undercover Agent to recover the balance of the check transaction. This was the second and final meeting between Muthana and the Undercover Agent regarding the EDD undercover operation. During the meeting, Muthana provided the Undercover Agent with $44,296.00 in cash and kept $4,440.00 as his fee for cashing the checks.

37.    Muthana negotiated all of the 324 EDD checks for a total amount of $209,130.00 through his Ranchito Market business account, between September 29, 2005, and January 9, 2006.

2.    Contraband Cigarettes:

38.    On July 1, 1959, the State of California enacted an excise tax of three (3) cents on each pack of cigarettes sold within the state. Since the tax was established, California has raised

this excise tax three times to its current 87 cents per pack. The amount of tax required to be collected by the State of California on each pack of cigarettes sold within the state makes illegal distribution of untaxed cigarettes a lucrative endeavor for criminal racketeers.

39.    Every state imposes some tax on the sale of cigarettes. The liability for these taxes generally arises once the cigarettes enter the jurisdiction of the state. The vast majority of states requires a "tax stamp or imprint" to be placed on packages of cigarettes to demonstrate that the state tax has been paid. Wholesale distributors in the various states, to include the State of California, are generally responsible for the payment of the state tax and for affixing the tax stamp or imprint.

40.    The illegal trade in cigarettes and tax stamps deprives governments of lawful tax revenue and harms legitimate trade channels.

41.    During the January 12, 2006, meeting, the Undercover Agent briefly discussed with Muthana the possibility of Muthana purchasing contraband Marlboro cigarettes.

42.    On July 13, 2006, during a consensually recorded conversation between the Cooperating Witness and Muthana, the Cooperating Witness advised Muthana that he (CW) had spoken to his friend (JTTF Agent) and that his friend's uncle (UCA) wanted to meet with Muthana on July 18, 2006. The Cooperating Witness stated that the Undercover Agent would be bringing the cigarettes he (UCA) had for sale to the meeting. The Cooperating Witness advised that the cigarettes were stolen out of state and the tax stamps were from California. Muthana asked the Cooperating Witness if the stamps were stolen as well and the Cooperating Witness told Muthana that they were. The Cooperating Witness advised Muthana that the tax stamps would pass all the tests that the police use. Muthana asked the Cooperating Witness how much

14

the cigarettes would cost and the Cooperating Witness advised he would get an exact price from
his friend.

43.     The Cooperating Witness explained to Muthana that his friend (JTTF Agent) also
advised that they (Muthana and the CW) would need to place the tax stamps on the packs of
cigarettes as soon as they received them. Muthana agreed and stated, "Yeah we have to, when
we get them we'll do it right away, we don't want any trouble." Muthana advised the Cooperating
Witness to get an exact price for the cigarettes and stated that they would buy whatever amount
the Undercover Agent could provide.

44.     Agents from the Bureau of Alcohol, Tobacco and Firearms (ATF) supplied four
cases of Marlboro cigarettes (48,000 cigarettes) and two rolls of specially marked California
cigarette tax stamps to be used for the controlled buy operation.

45.     On July 18, 2006, ATF agents with the assistance of Fresno JTTF agents
conducted a controlled sale of four cases of reportedly stolen Marlboro cigarettes and two rolls of
counterfeit State of California cigarette tax stamps to Muthana in the parking lot of the Save Mart
store, located at 3318 Whitson Avenue, Selma, California.

46.     During the consensually monitored meeting between Muthana, the Cooperating
Witness and the Undercover Agent in the Save Mart parking lot, Muthana agreed to and
purchased four cases of reportedly stolen Marlboro cigarettes and two rolls of counterfeit
California tax stamps. Muthana paid the Undercover Agent $4,800.00 in United States currency
for the items. The contraband cigarettes and tax stamps were placed into Muthana's red
Chevrolet Avalanche truck (new, no licence plates) and Muthana and the Cooperating Witness

15

left the location.

47.   The Undercover Agent met agents at a predetermined location after the buy operation and ATF agent Helen Dunkel retrieved and took custody of the $4,800.00 and the recording device used during the buy operation.

### 3.   Material Support to a Terrorist Organization and Illegal Money Transmitting Business:

### 1.   Background:

### a.   Terrorist Organization:

48.   Under Title 18, United States Code, Section 2339B it is unlawful to provide "material support or resources" to an organization the Secretary of State has designated as a "Foreign Terrorist Organization."  The Secretary of State designates Foreign Terrorist Organizations (FTO's), in consultation with the Attorney General and the Secretary of the Treasury.  These designations are undertaken pursuant to the Immigration and Nationality Act (INA), as amended by the Antiterrorism and Effective Death Penalty Act of 1996.

49.   On October 8, 1997, Department of State designated Hizballah as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, as added by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 302, 110 Stat. 1214, 1248 (1996), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996).  62 Fed. Reg. 52,650 (1997).  Hizballah has been continuously designated since that date.

50.   In September 2006, FBI Buffalo JTTF advised members of the Fresno JTTF that during an ongoing Buffalo investigation that involving money laundering and unlicenced money

16

transmitting, one of the Buffalo subjects stated an individual in California could move

$100,000.00 overseas without problems.  Buffalo agents with the assistance of the Fresno JTTF

identified the California individual as Muthana and an Immigration and Customs Enforcement

Confidential Witness (ICE CW) was introduced telephonically to Muthana by a Buffalo subject.

Several consensually monitored phone calls were made between the Immigration and Customs

Enforcement Cooperating Witness and Muthana discussing the movement of money overseas.

The Immigration and Customs Enforcement Cooperating Witness arranged to meet with

Muthana in Fresno, California, on November 11, 2006, in order to personally make arrangements

for the movement of $60,000.00 overseas and to establish a possible future ongoing business

relationship.

51.     On November 11, 2006, a joint undercover money laundering sting operation took

place at the Piccadilly Inn, Room 137, located at 5115 East McKinley Avenue, Fresno,

California.  The  consensually monitored meeting (audio and video) involved Muthana, an

Immigration and Customs Enforcement Undercover Agent, an Immigration and Customs

Enforcement Cooperating Witness and a FBI Cooperating Witness.

52.     During the meeting, the Immigration and Customs Enforcement Undercover

Agent and Immigration and Customs Enforcement Cooperating Witness informed Muthana that

they are involved in various illegal activities to include counterfeit cigarettes, the sale of

counterfeit goods, and the sale of stolen property.  The Immigration and Customs Enforcement

Undercover Agent informed Muthana on approximately 2 occasions, that their (ICE UCA and

ICE CW) main client is Hizballah, and they (ICE UCA and ICE CW) need to get the money

($60,000.00) overseas to Hizballah to help rebuild Hizballah schools and bases.

17

53.    The Immigration and Customs Enforcement Undercover Agent explained to Muthana that Hizballah operatives in the United States provide them (ICE UCA and ICE CW) with the stolen merchandise. The Immigration and Customs Enforcement Undercover Agent and Immigration and Customs Enforcement Cooperating Witness then sell the merchandise at a considerable profit and after taking their cut, send the remaining amount back to Hizballah in Lebanon.

54.    Muthana was told by the Immigration Customs Enforcement Undercover Agent that if the guys of Hizballah in Beirut were happy, Muthana would get a bonus and the Immigration and Customs Enforcement Cooperating Witness told Muthana there would be more business on a monthly basis, not just a one time thing. The Immigration and Customs Enforcement Cooperating Witness stated that he would meet Muthana every month for 5-10 minutes and hand Muthana the money and leave. Muthana stated he could move $20,000.00 per week.

55.    At this meeting, Muthana took possession of the $60,000.00 and agreed to transfer the money for a 6% fee. The Immigration and Customs Enforcement Cooperating Witness and Immigration and Customs Enforcement Undercover Agent offered Muthana a bonus if he transferred the money directly to their bank in Bahrain, rather than going through Muthana's contact in Yemen and then to Bahrain. Muthana indicated he would consider this request. The Immigration and Customs Enforcement Cooperating Witness provided Muthana the bank name, account number and swift code for the UC account in Bahrain. Muthana provided his fax number to the Immigration and Customs Enforcement Cooperating Witness (559) 992-3861, which is the business telephone number for the Ranchito Market. The meeting concluded and

18

Muthana took the $60,000.00 that had been placed in a "GAP" bag and left the hotel. A surveillance team then followed Muthana back to his business/residence, located at 2749 Whitley Avenue, Corcoran, California.

56.     On November 13, 2006, the Immigration and Customs Enforcement Cooperating Witness receives a phone call from Muthana in California. The call was consensually monitored and recorded and Muthana informed the Immigration and Customs Enforcement Cooperating Witness that he (Muthana) would send the money directly to the bank in Bahrain, but wanted to be paid 10% of the amount being sent. The Immigration and Customs Enforcement Cooperating Witness informed Muthana he would check with his partner (ICE UCA) and get back to him.

57     On or about November 15, 2006, the Immigration and Customs Enforcement Cooperating Witness placed a consensually monitored phone call to Muthana and informed Muthana that he had spoken with his partner (ICE UCA) and they were willing to pay him a 10% fee to send the money directly to Bahrain. Muthana informed the Cooperating Witness he intended to send approximately $25,000.00 in the next day or so to Bahrain.

58.     On or about November 22, 2006, a deposit was received in the Immigration and Customs Enforcement undercover bank account in Bahrain from an individual/business named "Abdulla Q. Ahmed" in the amount of $24,988.00. No bank account was located on the transaction.

59.     On or about November 28, 2006, a deposit was received from bank account number 706-022456 into the Immigration and Customs Enforcement undercover bank account in Bahrain from an individual/business named "Abdulla Q. Ahmed, dba, Abdulla Inter." in the

19

amount of $29,990.00. Muthana has a Bank of the West business account under the name of
Abdulla's International Transfer, account #706-022456.

60.     As of November 28, 2006, the Immigration and Customs Enforcement undercover
bank account in Bahrain had received a total of $54,978.00 from the original $60,000.00 given to
Muthana to transfer overseas for Hizballah. Muthana retained $5,022.00 for his transaction fee.

61.     On January 27, 2007, the Cooperating Witness spoke with Muthana at the
Ranchito Market, and Muthana informed the Cooperating Witness that he (Muthana) had just
received a telephone call from "the Lebanese guys" (ICE CW) and discussed a money transaction
that they (ICE UCA and ICE CW) wanted to initiate. Muthana advised that they (ICE UCA and
ICE CW) wanted to send between $175,000.00 and $200,000.00 in the coming weeks. Muthana
was very excited about the transaction and informed the Cooperating Witness that he would
make approximately $15,000.00 from the deal. Muthana further stated to the Cooperating
Witness, "I hope I don't have any problems, because he said the money was going to Hizballah."
Muthana stated that he planned to send the money in increments of $25,000.00 to $30,000.00 per
week until the final amount was reached.

62.     On February 18, 2007, a second joint undercover operation targeting Muthana
took place in Room 123 of the Piccadilly Inn, located at 5115 East McKinley Avenue, Fresno,
California. The consensually monitored meeting (audio and video) involved Muthana, an
Immigration and Customs Enforcement Undercover Agent, an Immigration and Customs
Enforcement Cooperating Witness and a FBI Cooperating Witness.

63.     During the meeting, the Immigration and Customs Enforcement Undercover

20

Agent and Immigration and Customs Enforcement Cooperating Witness again informed Muthana that they are involved in various illegal activities. The Immigration and Customs Enforcement Undercover Agent and Immigration and Customs Enforcement Cooperating Witness again represented they had ties to Hizballah and requested Muthana help facilitate the movement of $80,000.00 in United States currency overseas to assist Hizballah with purchasing weapons and uniforms. Muthana agreed to assist them and wire transfer the money to the same Immigration and Customs Enforcement undercover bank account in Bahrain for an enhanced fee of 12%. The meeting concluded and Muthana took the $80,000.00 that had been placed in a brown paper grocery bag with paper handles and left the hotel. A surveillance team then followed Muthana back to his business/residence, located at 2749 Whitley Avenue, Corcoran, California.

64. The Immigration and Customs Enforcement Undercover Agent told Muthana that people in Beirut, Lebanon, were very happy and impressed with his attitude (Muthana). The Immigration and Customs Enforcement Undercover Agent said his guy Samir in Lebanon had said that they needed a lot of money moved over to Lebanon to buy weapons and uniforms and he (Samir) promised to give a bonus if he (Muthana) could increase the flow of money. Muthana said he preferred to transfer money through Bahrain and he (Muthana) could not move more than $25,000.00 dollars a week. The Immigration and Customs Enforcement Undercover Agent told Muthana that Samir, the Hizballah guy, in Beirut trusted Muthana and that he (Samir) was happy the money was from Muthana. The money was needed in Lebanon quickly and Samir had agreed to increase Muthana's commission to 12%.

b. Money Remitting Business:

21

65.     The Financial Crimes Enforcement Network (FinCen) within the United States

Department of the Treasury is charged with administering the Bank Secrecy Act, to include

Money Services Business (MSB), supporting law enforcement, intelligence, and regulatory

agencies through sharing and analysis of financial intelligence. The mission of FinCen is to

safeguard the financial system from the abuses of financial crimes, including terrorist financing,

money laundering, and other illicit activity.

66.     Muthana is currently registered with the FinCen as a MSB under the name

Abdulla Q. Ahmed, dba Ranchito Market. The Ranchito Market is registered with FinCen to

cash checks and transmit money. Muthana and the Ranchito Market are licensed as an agent of

Continental Exchange Solutions Inc. with the State of California, as required by law, but are not

licensed independently with the State of California to send money abroad as a money transmittal

company .

67.     Continental Exchange Solutions Inc. Compliance Officer Karen Barnes stated that

an agent of their company could only use computer equipment and software supplied by the

company to legally transmit money through their system. Any company agent not going through

their system was out of compliance and could not transmit money under their company umbrella.

Regarding the November 11, 2006 meeting, Muthana did not use Continental Exchange

Solutions Inc. to transmit the money to the Immigration and Customs Enforcement undercover

bank account in Bahrain.

68.     Despite this requirement, Muthana did not use the Continental Exchange

Solutions Inc. transmittal system to transfer $54,978 in United States currency, in the two

22

separate transactions describe above, from the United States to the undercover bank account in Bahrain. Additionally, the money did not appear to be run through any other approved MSB.

69.　　Information provided by a FBI Cooperating Witness during the investigation indicates Muthana keeps business records and United States currency at all locations described in Attachment A.

70.　　Based on my experience and training, as well as the knowledge and experience of other agents and law enforcement officers (with whom I have had discussions) involved in investigations similar to this one, I believe that individuals involved in State of California EDD fraud schemes, money laundering, providing material support to a designated FTO, unlicensed money transmitting, and the purchase of contraband cigarettes frequently generate and maintain items such as the following:

A. Individuals who engage in EDD fraud schemes, money laundering, providing material support to a designated FTO, unlicensed money transmitting, and the purchase of contraband cigarettes often receive significant profits. These profits are often maintained in the form of cash, in bank accounts in nominee names or in offshore bank accounts, as it is difficult to convert their illegal profits into assets without drawing suspicions from the Internal Revenue Service (IRS) and other law enforcement investigators. This money, or documentation revealing the location of the illegal profits, is usually found in residences, on the persons, in businesses, in vehicles, in associates's businesses, residences and vehicles, and in safe deposit boxes.

B. Such individuals - who are involved in the above mentioned illegal activities - frequently maintain records of such transactions similar to record keeping of legitimate

23

transactions. Furthermore, such records are frequently retained for extended periods of time, often years after the actual fraudulent activities occurred. These records often identify co-conspirators, the location of bank accounts associated with the fraudulent activity (including nominee names used to maintain these accounts) and the identification of property, both real and personal, belonging to the subject or his/her associates and co-conspirators, which were purchased with criminally obtained funds. In addition to the residence location and business locations, such records sometimes may be found on the person of the individual, e.g. in the person's pockets, wallet, purse, and in the individual's vehicles.

C. Individuals involved in EDD fraud schemes, money laundering, providing material support to a designated FTO, unlicensed money transmitting and the purchase of contraband cigarettes often receive significant, unexplained and unreported income. The evidence of such income may be inconsistent with other evidence such as state and federal tax returns, banking and financial institution records, bank statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers and accounting records. This evidence will assist the United States in identifying property, both personal (including cash deposits) and real, which may be subject to seizure by the government under existing law. In addition to the residence location and business locations, such records sometimes may be found on the person of the individual, e.g. in the person's pockets, wallet, purse, and in the individual's vehicles.

D. Individuals involved in EDD fraud schemes, money laundering, providing material support to a designated FTO, unlicensed money transmitting, and the purchase of contraband cigarettes often seek to launder the profits from their criminal transactions by

24

diverting the money they receive into purchase of real estate, vehicles, precious metals, jewelry, and other tangible assets. Such individuals often maintain records which identify or relate to the identification of this property which includes rental receipts, rental agreements, utility bills, lease agreements, overnight mail receipts, telephone bills, telephone number lists, canceled mail, written notes, ledgers, records, personal diaries and memoranda, business records, financial institution statements, canceled checks, money orders, deposit slips, check and savings books, wire transfer slips, evidence of rental or control of safe deposit boxes, credit card bills and statements, travel records, loan statements, tax returns, vehicle registration and ownership information, vehicle and property rental and lease and purchase agreements. In addition to the residence location and business locations, such records sometimes may be found on the person of the individual, e.g. in the person's pockets, wallet, purse, and in the individual's vehicles.

71.     Also, based upon my training and experience, persons involved in the above described crimes maintain records relating to those crimes on computers. Persons utilizing computers to facilitate these crimes or maintain records of criminal transactions will possess and maintain computers, which include the central processing units, external and internal drives, external and internal storage equipment or media, terminals or video display units, and peripheral equipment such as CD-ROM duplicators, fax machines, copiers, keyboards, printers, modems, programmable telephone dialing devices, etc., to communicate with others, maintain records, and to commit the fraud.

72.     Based upon my knowledge, training and experience I am aware that searches and seizures of evidence from computers commonly requires agents to seize all computer items and the system itself (hardware, software, and instructions) to be searched later by a qualified

25

computer examiner in a laboratory or other controlled environment. This is almost always true because computer storage devices can store the equivalent of thousands of pages of information. When the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this kind of data search on site. I know from my training that data and information stored in electronic format may be found not only on the hard disk drive of a computer, but on other computer equipment and related peripherals, including back-up tapes, floppy disks, CD-ROMS, handheld organizers, and other devices capable of storing information in electronic format. Additionally, searching and seizing information often requires agents to seize most or all the computer hardware to be searched later by a qualified computer examiner in a laboratory or other controlled environment. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (either from external sources or from a destructive code imbedded in the system as a "booby trap"), the controlled environment of a laboratory is essential to its complete and accurate analysis.

26

73.     As previously set forth, the actual search of a computer and related software in the controlled environment of a laboratory is a complicated process that takes in excess of ten days to complete. It often takes weeks or months to complete. Against this background and based on my training and experience, I hereby request sixty (60) days from the date of seizure to complete the search under controlled conditions. In order to fully retrieve data from a computer system, the examiner needs all electronic storage devices as well as the central processing unit (CPU). As in this case where the evidence may consist partly of printed documents, the monitor and printer are also sometimes necessary to show the nature and quality of the graphic images which the system could produce. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media). The term "computer", as used herein, is defined pursuant to Title 18, United States Code, Section 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." Computer hardware consists of all equipment, which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but is not limited to) any data processing devices (such as central processing units, self-contained "laptop" or "notebook" computers, hand-held electronic organizers, and "personal digital assistants", internal and peripheral storage devices (such as fixed disks, external hard disks, tape drives, and other memory storage devices), and related communications devices such as modems, cables and connectors, programmable telephone dialing or signaling devices, and

27

electronic tone generating devices, as well as any device, mechanism or part that can be used to restrict access to computer hardware such as physical keys, dongles and locks. As part of his search of the computer system and peripherals, the computer specialist searching the computer may need to make a mirror image copy of the hard drives, backup media, floppy diskettes, disk carriage, CD-ROMS, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks on which data was stored. A mirror image copy is an exact copy of the storage media. This is necessary to accurately reproduce the documents on the storage devices and to preserve the integrity of the data. The search will then be conducted using the mirror image copy. Permission is requested for the computer specialist to make a mirror image copy of the above storage media and conduct a search of the computer systems, hardware, software and backup media for the specific items described in this affidavit and Attachment B.

## CONCLUSION

74.     Based on the forgoing, there is probable cause to search for and seize items that constitute evidence of the commission of a criminal offense, and contraband, the fruits of crime, and things otherwise criminally possessed and property designed or intended for use or which is or has been used as the means of committing a criminal offense, as described in this affidavit, for violations of Title 18, United States Code, Sections 1341, 1956, 2339B, 2339C, 1960 (a)(1)(C)

and 2342 (a). Based on the foregoing information provided in this affidavit, I believe that there is probable cause to search for and seize the items as described in Attachment B at the locations described in Attachment A.


BRAD L. LEHR
Task Force Officer
Joint Terrorism Task Force
Federal Bureau of Investigation
United States Department of Justice


Approved as to Form


STANLEY A. BOONE
Assistant United States Attorney


Subscribed and sworn before me this _24th_ day of February, 2007 at Fresno, California.


UNITED STATES MAGISTRATE JUDGE
Eastern District of California

29

**ATTACHMENT A**

**DESCRIPTION OF PROPERTY TO BE SEARCHED**


**2749 Whitley Avenue, Corcoran, California,** is described as the Ranchito Market, a
small convenience store with an attached single family residence located on the western
outskirts of Corcoran, California. The convenience store is located on the south side of
Whitley Avenue east of James Avenue and is further described as constructed of blocklite
brick facade painted white with a light grey composite shingle roof. The address of 2749
in affixed to the building just above the front glass entry doors of the store and are black
in color, approximately 4" high. A large white sign with the name "Ranchito Market" in
large red letters is attached to the building above the store entrance, along with a large
pole sign west of the entrance with the name of the Ranchito Market. East of the store's
main entrance is a second entry with a white security door and a single car aluminum
garage door is on the far east side of the building. The single-family residence is
physically attached to the store and is described as a single story, salmon colored stucco
home with blue wood trim and a light grey composite shingle roof. The residence faces
west and the front door is enclosed by a black metal security door. The location also has
a blue colored outbuilding with a brown composite roof on the south side of the
residence.


**2838 Waukena Drive, Tulare, California**, is described as the Ranchito Market #2, a
small convenience store located in rural Tulare County east of Corcoran, California. The
convenience store is on the north side of Waukena Drive west of Stevenson Drive and is
further described as constructed primarily of slatted wood siding. The front of the
building is blue in color and the south and east sides are painted white with a brown
composite shingle roof. The south side of the structure is constructed of metal framing
and glass, with stone veneer on the lower half. The front door of the business faces south
and the numbers 2838, in black, are attached vertically to the building on the west side of
the front door. There is a black, sliding security fence attached to the south side of the
building. A white sign, west of the store's entrance, is attached to a white pole and reads
"Ranchito Market #2" in red letters.


The search of these locations shall include all rooms, annexes, attics, basements, garages,
carports, outside yard, curtilage, mailboxes, trash containers, debris boxes, storage
lockers and areas, cabinets, rooms, sheds and outbuildings associated with these premises
and shall extend into desks, cabinets, safes, briefcases, purses, trash receptacles,
electronic storage devices, and other storage locations within the premises in which items
in Attachment B may be found.


The search of these locations shall also authorize officers conducting the search to require
the production of identification of any person reasonably believed by the officers to have
possession and control of the premises. The search shall also authorize officers to search

the persons and items attached to them (such as purses, backpacks, etc.) encountered at the various search locations, whether they are located indoors, outdoors or in an automobile found within the locations and/or the curtilage of the location.

## ATTACHMENT B
## LIST OF ITEMS TO BE SEIZED

The items to be searched and seized from the locations described in Attachment A, any and all outbuildings, including but not limited to attached and detached buildings, any and all vehicles found therein including but not limited to vehicles registered to Abdulla Qassem Ahmed Muthana, also known as Abdulla Qassem Ahmed, which constitute evidence of the commission of the offenses described below, contraband, the fruits of crime, and things otherwise criminally possessed and property designed or intended for use or which is or has been used as the means of committing a criminal offense, for violations of Title 18, United States Code, Sections 1341, 1956, 2339B, 2339C, 1960(a)(1)(C) and 2342 (a) and consist of the following items and documents created after January 1, 2005, or describing or related to events between January 1, 2005 to the present:

1.    Any and all business records, including bank records, documents or materials pertaining to any and all businesses owned or partially owned by Abdulla Qassem Ahmed Muthana, also known as Abdulla Qassem Ahmed from January 1, 2005 until present, including but not limited to business and personal financial documents, bank statements, signature cards, canceled checks, drafts, wire transfers, credit memos, deposit slips, receipts, disbursements journals, records of cash transactions, money orders, cashier's checks, check stubs, check registers and checking and savings account documents, and brokerage account documents;

2.    Any and all personal financial documents for all savings accounts, retirement accounts, checking accounts, credit card accounts, investment accounts, including statements of such accounts, safe deposit box records and keys, all loan documents, including deeds of trusts, summaries of loans and loan security agreements, financial statements, records of payment, savings accounts and any related documents, including United States Treasury bills, time certificates of deposit and other forms of savings accounts;

3.    Address verification and establishment documents, escrow statements, deeds of trust, grant deeds, rental and lease agreements and other documents showing dominion and control over the subject premises as well as documents showing dominion and control over other residences, businesses and/or storage units. These documents would include but are not limited to rental and/or lease agreements, keys, and utility and telephone billing records;

4.    Records which evidence reported income, such as state and federal tax returns and return information;

1

5.   Any and all items and/or documents that would tend to identify persons who acted as facilitators or co-conspirators in acts of fraud and related activity in connection with mail fraud, money laundering, unlicensed money transmitting and purchase of contraband cigarettes, including but not limited to, pictures and/or photographs depicting an association with co-conspirators, financial documents, correspondence, vehicle registration/title document, telephone answering device tapes, and billing records for telephones, cellular telephones, and paging devices;

6.   Writings or objects in Arabic and/or other foreign languages will be seized in their entirety and thereafter analyzed by appropriate individuals fluent in Arabic and/or other foreign languages to determine whether such seized items constitute evidence, or fruits and instrumentalities of the aforementioned offenses;

7.   Any and all identifiable contraband cigarettes to include specially marked State of California cigarette tax stamps supplied by ATF;

8.   Any and all records and computer systems, including any and all computer related "records" "documents" and "materials" including tapes, cassettes, cartridges, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, and any computer related items;

9.   Computer equipment and devices including, but not limited to computer-related equipment, including computer hardware, computer software, electronic data processing and storage devices, central processing units, internal peripheral storage devices, such as fixed disks, external hard disks, floppy disks, drives and diskettes, tape drives and tapes, optical storage devices or other memory storage devices, peripheral input/output devices such as keyboards, printers, video display monitors, optical readers, and related communications devices such as modems, together with system documentation, operating logs and documentation, software and instruction manuals, all passwords, test keys, encryption codes or similar codes that are necessary to access computer programs, data or other information or to otherwise render programs into useable form.

      a.   In searching for data capable of being read, stored or interpreted by a computer law enforcement personnel executing this search warrant will employ the following procedures:

      b.   Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

2

c.  If the computer equipment and storage devices cannot be searched on site and it has been determined that the items are not instrumentalities or fruits of the offense stated above, do not contain contraband, and are not otherwise illegally possessed, then the computer personnel will determine whether it is practical to copy the data during the execution of the search in a reasonable amount of time without jeopardizing the ability to preserve the data.

d.  If the computer personnel determine it is not practical to perform an on-site search or make an on-site copy of the data, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

e.  If law enforcement personnel determine either on-site or during a subsequent off-site search, that any computer equipment, storage device or data (1) is an instrumentality of the offense stated above, meaning that it was designed or intended for use, or is being or has been used, as the means of committing the offense; (2) contains any contraband, such as counterfeit or stolen software, child pornography, national security information, or unauthorized access devices such as stolen credit card numbers; (3) is the fruits of criminal activity; or (4) is otherwise criminally possessed, the property shall be seized and not returned pursuant to Federal Rule of Criminal procedure 41 (b).

f.  Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity,(3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offense specified above.

g.  In searching the data, the computer personnel will examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel will search for the attempt to recover "deleted" "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

h.  If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items within a reasonable period of time, not to exceed 60 days from the date of seizure;

10.  In order to search for data that is capable of being read or interpreted by a computer, law enforcement will need to seize and search the following items, subject to the procedures set forth above:

a.  Any computer equipment and storage device capable of being used to commit,

3

further or store evidence of the offense listed above;

b.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment modems, docking station, monitors, printers, plotters, encryption devices, and optical scanners;

c.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, tapes, CD-ROMs, CD-Rs, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks and personal digital assistants;

d.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.  Any passwords, password files, text keys, encryption codes or other information necessary to access the computer equipment, storage devices or data;

11.  United States and foreign currency;

12.  Any and all passports and/or travel documents; and

13.  Any and all materials related to Hizballah.

4