# United States District Court

_____WESTERN_____    **DISTRICT OF**    ___NEW YORK___

**UNITED STATES OF AMERICA**

v.

**YEHIA ALI AHMED ALOMARI
SALEH MOHAMED TAHER SAEED
MOHAMED AL HURAIBI**

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

Filed

FEB 2 4 2007

**CASE NUMBER: 07-M- 4009**

AT _____ O'C _____ M
BY _____
Title _____

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. Between at least April 7, 2005, up and to including February 2007, in the__ **Western** __ District of _ New York _ and elsewhere, the Defendants, (Track Statutory Language of Offense)

did knowingly, willingly, and unlawfully combine conspire and agree together and with others, known and unknown, to commit violations of Title 18, United States Code, Sections 1956(a)(3)(A) and (B).

All in violation of Title 18, United States Code, Section 1956(h).

I further state that I am a_Special Agent with Immigration and Customs Enforcement_ and that this complaint is based on the following facts:
Official Title

    See attached affidavit.

Continued on the attached sheet and made a part hereof:   ( **X**) Yes    ( ) No

_James K. Crawford_
Signature of Complainant
**JAMES K. CRAWFORD**

Sworn to before me and subscribed in my presence,

February 24, 2007 _____   at   _ Rochester, New York _____
Date                                       City and State

**HON. MARIAN W. PAYSON
U.S. MAGISTRATE JUDGE**
Name & Title of Judicial Officer

_Marian W. Payson_
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

State of New York    )
County of Monroe     ) ss
City of Rochester    )

JAMES K. CRAWFORD, being duly sworn, deposes and states as follows:

1.    I am a Senior Special Agent, Criminal Investigator employed by the United States Department of Homeland Security, Bureau of Immigration and Customs Enforcement (hereinafter, "ICE"), and have been employed by ICE or its predecessor, the United States Immigration and Naturalization Service, for the past thirteen years.  For the past two and a half years, I have been assigned to the Federal Bureau of Investigation, Joint Terrorism Task Force (hereinafter, "JTTF"), located in Rochester and Buffalo, New York. My responsibilities with ICE include enforcing the country's immigration and customs laws, while my responsibilities with the JTTF pertain to the investigation and prevention of terrorist incidents and terrorist organizations.  As part of my official duties, I have received specialized training on techniques to detect money laundering and currency crimes.  I have conducted and/or assisted in numerous cases involving money laundering, illegal money transmitting services and the fraudulent reporting of currency transactions.

2.    I am a "federal law enforcement officer" within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure. I am empowered to request issuance of a search warrant to search and seize property that constitutes evidence of the commission of a criminal offense, contraband, fruits of the crime, or things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense.

3.    This affidavit is made in support of an application by the Government of the United States of America for the issuance of a criminal complaint charging **YEHIA ALI AHMED ALOMARI, SALEH MOHAMED TAHER SAEED** and **MOHAMED AL HURAIBI** with a violation of Title 18, United States Code, Section 1956(h) (conspiring to launder and laundering monetary instruments).[1]

---

[1]Section 1956(h) prohibits any person from conspiring to commit any offense defined in section 1956. Section 1956(a)(3) provides:

Whoever, with the intent—

(A) to promote the carrying on of specified unlawful activity;
(B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
(C) to avoid a transaction reporting requirement under State or Federal law,

conducts or attempts to conduct a financial transaction

-2-

4.   This affidavit is submitted for a limited purpose, that is, a probable cause determination; not all facts of this investigation are contained herein.  This affidavit is based upon my personal knowledge, experience, training, information supplied to me by other law enforcement and governmental personnel, my review of documents and records, as well as other information developed during the course of this investigation.  It is further based on my review of initial English transcripts of Arabic language conversations consensually recorded during the course of this investigation, as well as debriefings of the confidential witness and undercover agent utilized in this investigation.

## I.   SUBJECTS OF INVESTIGATION

5.   Over past two years, Immigration and Customs Enforcement and other law enforcement agencies have been investigating the following individuals:

a.   **SALEH MOHAMED TAHER SAEED** (hereinafter, "SAEED"), dob 5/25/1979, who is the operator of the "Durnan Mini Mart" located at 934 Hudson Avenue, Rochester, New York. It is believed that **SAEED** resides at 936 Hudson Avenue, Rochester, New York.

---

involving property represented to be the proceeds of a specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, shall be fined under this title or imprisoned for not more than 20 years, or both.

-3-

b.   **YEHIA ALI AHMED ALOMARI** (hereinafter "ALOMARI"), dob 12/10/1980, who is the operator of the "Short Deli & Grocery," located at 711 North Goodman Street, Rochester, New York.

c.   **MOHAMED AL HURAIBI** (hereinafter "AL HURAIBI"), dob 01/01/1957, who used to be be part-owner/manager of the "MOJO's Stars" restaurant located at 651 Jefferson Street, Rochester, New York.

6.   As is set forth in more detail below, it is alleged that the defendants have transferred approximately two hundred thousand dollars outside of the United States after the money was represented to be proceeds of specified unlawful activity, and furthermore, that the money was intended for Hezbollah.

7.   On October 8, 1997, Department of State designated Hezbollah as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, as added by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 302, 110 Stat. 1214, 1248 (1996), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996).   62 Fed. Reg. 52,650 (1997).   Hezbollah has been continuously designated since that date.

-4-

8.   This investigation was initiated when the Intelligence Collection and Analysis Team (ICAT) of the Special Agent in Charge (SAC) Buffalo Office of Immigration and Customs Enforcement, uncovered information indicating **SAEED**'s social security number was associated with approximately 324 Currency Transaction Reports (CTR's) totaling approximately 12.3 million dollars between October of 2002 through November of 2004.   Additionally, it was determined **ALOMARI**'s social security number was associated with multiple Currency Transaction Reports totaling approximately 2.6 million dollars during a similar time frame as **SAEED**.

## II.   MONEY LAUNDERING INVESTIGATION

### A.   Introduction of CW and Initial Money Transfer of $15,000

9.   In January 2005, a Confidential Witness know as SA 418 BU (hereinafter, "CW") was directed to acquaint himself with **SAEED** with the intention of requesting **SAEED**'s assistance in illegally moving large sums of money out of the United States.   The CW is presently cooperating in exchange for monetary compensation and for becoming a naturalized United States citizen.   In November 2006, the CW became a U.S. citizen.

-5-

10.  On or about April 7, 2005, the CW met with **SAEED** at **SAEED**'s store located at 934 Hudson Avenue, Rochester, NY.  Prior to entering the store, the CW was outfitted with an electronic recording device.   While inside **SAEED**'s store, the CW informed **SAEED** the CW had approximately $12,000 that the CW wanted to move out of the United States.  **SAEED** advised the CW that he (**SAEED**) knew people who can help him, and typically the charge is $50.00 per every $1,000 sent overseas.

11.  On or about April 21, 2005, the CW met again with **SAEED** at **SAEED**'s store.  Prior to the meeting, the CW was outfitted with an electronic recording device.   During this meeting, the CW informed **SAEED** the money the CW wanted to move out of the United States was obtained from making fraudulent documents.   The CW further stated that he could not place this money in a bank, because the CW was unable to explain the source of the money.  As such, the CW wanted to get the money out of the United States by another means.   The CW informed **SAEED** the CW had approximately $300,000 in cash that he needed to move out of the United States. While the CW was at the store, **SAEED** telephoned a person in Yemen. **SAEED** informed the CW that the person in Yemen could not transfer the money at this time.  However, **SAEED** informed the CW he (**SAEED**)

-6-

would try to find someone who could help him get the money out of the United States.


12.  On or about July 12, 2005, the CW met again with **SAEED** at **SAEED**'s store.  Prior to this meeting, the CW was outfitted with an electronic recording device.  During this meeting, the CW and **SAEED** discussed sending money out of the United States.  **SAEED** asked the CW how much the CW wanted to send.  The CW  said he would send $15,000 the first time and see if it safely arrived in Lebanon. **SAEED** informed that CW he would contact a friend of his known as Nasser, who resides in California.


13.  On or about July 27, 2005, the CW met with **SAEED** again at **SAEED**'s store.  During this meeting, **SAEED** instructed the CW to go to **SAEED**'s family's store in California and give them the money. **SAEED** explained that Nasser would stop and pick up the money from the store or someone from the store would deliver the money to Nasser.  Nasser would then get the money to the hawaladar, who would then get the money to Yemen.  **SAEED** said that once the money is in Yemen, **SAEED**'s brother-in-law[2] would pick up the money and

---

[2]The name of the brother-in-law is known, but has been omitted from this affidavit.

deposit the money into the bank and request that the bank transfer the money to a reciprocal bank in Lebanon.

14.   On August 4, 2005, at approximately 4:38 p.m. (west coast time), the CW, in the presence of your affiant, placed a consensually monitored phone call to **SAEED** at (585) 266-9334.  The CW informed **SAEED** he had arrived in San Francisco, California with approximately $15,000.  **SAEED** instructed the CW he (**SAEED**) would call the CW back and provide the telephone number for a person known as KASSEM.  The CW would then call KASSEM and discuss dropping the money off.

15.   On August 4, 2005, at approximately 5:10 p.m. (west coast time), the CW, while in the presence of your affiant, received a telephone call from **SAEED**, which was consensually monitored. **SAEED** stated Muktar would count the money when the CW arrives at KASSEM's store.  In a subsequent monitored conversation between the CW and KASSEM, KASSEM provided the CW with directions to his store in Stockton, California (hereinafter "Stockton Store").

16.   On August 8, 2005, at approximately 9:30 a.m. (west coast time), the CW was fitted with a transmitter and digital recorder. At approximately 11:12 a.m., the CW arrived at the Stockton Store

-8-

with the $15,000 contained within a large McDonalds bag.   An individual named Muktar greeted the CW, took possession of the $15,000, and then counted the money via an electronic money-counting machine.   The CW was directed to the adjoining liquor store located next door, where he was introduced to KASSEM, who is believed to be Muktar's relative.   While the CW was at this location, the CW observed KASSEM place approximately 15-20 phone calls, apparently in an effort to locate someone to make the money transfer in one lump sum, as the CW had requested.   Based on statements made by KASSEM, some of the people KASSEM spoke with indicated they could send a few thousand every day, but most were not willing to send all of the money as one transfer.   At the end of the CW's visit in the liquor store,  KASSEM informed the CW the money would be in Fresno within two hours (on credit) and that he (KASSEM) would drive the money to Fresno the following day.   Area surveillance provided by the Resident Agent in Charge (RAC) Immigration and Customs Enforcement personnel produced negative results as no one was observed departing the store carrying the McDonalds bag and or any bag or container of similar size.   After a period of time law enforcement left the area, in an effort not to alert the Stockton Store employees of the surveillance.

17.  A bank account had been established at the Bank of Arab in Lebanon for use in this operation.  On August 20, 2005, this account received an inward transfer of $13,996.99. This amount represents the anticipated total to be received, minus the payment of points and fees in the administration of the money transfer, both domestic and foreign.

18.  On August 23, 2005, at approximately 9:24 a.m., the CW, after being fitted with a digital recording device for consensual monitoring, met with **SAEED** at **SAEED**'s store.  The CW thanked **SAEED** for all his assistance in making sure the money transfer went through without any problems.  **SAEED** informed the CW he called his brother-in-law in Yemen everyday, instructing him to go to the Hawaladar in Yemen.  According to **SAEED**, his brother-in-law picked up the money, deposited into a Bank of Arab account in Yemen, and then transferred the money to the CW's Bank of Arab account in Lebanon.  The CW reminded **SAEED** the money is from fraudulent credit card activity, and if encountered by law enforcement, the CW would lose the money because the CW cannot tell law enforcement about the source of the funds.

-10-

B.    **December 2005 Transfer Of $20,000**

19.    On or about November 23, 2005, the CW placed a
consensually monitored phone call to **SAEED**.  During this call, the
CW thanked **SAEED** for helping the CW send the money ($15,000) from
California.  The CW then asked **SAEED** if he would be willing to help
the CW transfer another $20,000 out of the United States.  **SAEED**
informed the CW it would not be problem.  The CW informed **SAEED**
that the CW had finally obtained his green card, which the CW had
previously informed **SAEED** he paid an immigration official several
thousand dollars for.  During the telephone conversation, the CW
asked **SAEED** if he would have any customers willing to buy similar
green cards.  **SAEED** answered in the affirmative, and the CW and
**SAEED** agreed to talk more when they saw each other.


20.    On December 5, 2005, at approximately 2:21 p.m., the CW
placed a consensually monitored phone call to **SAEED**.  During this
call **SAEED** informed the CW that a friend of his, Yehia **ALOMARI**, was
willing to help the CW transfer money out of the United States.
**SAEED** informed the CW that **ALOMARI** would allow the CW to deposit
money into **ALOMARI**'s Bank of America account, and would in turn
release money from a bank account in Yemen for the CW.  **SAEED**
provided a Bank of America account number to the CW.  This Bank of

America account is in the name of **ALOMARI** and addressed to 281 Carter Street, Rochester, New York.

21.   On both December 14 and 15, 2005, your affiant instructed the CW to meet the targets of the investigation and transfer $20,000 in United States currency.[3]   The first meeting took place on December 14, 2005, and involved turning $11,000 over to **SAEED**, which **SAEED** would then convert into money orders.   The second meeting on December 15, 2005, involved transferring $9,000 in United States currency to **ALOMARI**, who had agreed to release approximately $5,000 from his bank account in Yemen and conduct a direct wire transfer of $3,200 from his bank account with Bank of America to the CW's account in Lebanon.   During this meeting, **SAEED** indicated he would sending the money orders to Yemen via DHL, which your affiant knows to be an express mail company.   Further details containing these money transfers are detailed below.

22.   On December 14, 2005, at approximately 9:45 a.m., the CW met with the Immigration and Custom Enforcement Special Agents Meyer and Braisted, as well as your affiant at a Rochester hotel.

---

[3]This transfer was also discussed in a meeting occurring on December 13, 2005.  The purpose of this meeting was just to discuss the transfer of money and not to conduct the transfer of money at that time.

Federal agents then provided $11,000 in United States currency to the CW. The CW was fitted with a digital recording device and a transmitter. At approximately 12:00 p.m., the CW entered **SAEED**'s store. The CW gave $11,000 to **SAEED**, and **SAEED** was heard via the transmitter speaking in English and Arabic and counting the money. The CW informed **SAEED** he was being paid $500 for his arranging of the $15,000 transfer in August 2005, and $500 for arranging this transfer of $20,000 (including commission and bank fees). Additionally, the CW informed **SAEED** the CW planned on paying **SAEED**'s brother-in-law the same amount as last time (approximately $300). **SAEED** stated he intended to convert the $10,000 cash into a cashiers check from his bank, another bank check from a friends account, and the rest would be converted into money orders. **SAEED** further explained these checks and money orders would then be forwarded to a hawaladar in Yemen via DHL.

23. On the evening of December 14, 2005, the CW received an unexpected invitation to attend a social get together hosted by **SAEED** at **SAEED**'s store. Due to the unexpected nature of this gathering, no electronic recording of conversations was made. At this party the CW met two older Yemeni males, whom the CW believed were held in high regard by the others in attendance. They were

-13-

Mohamed **AL HURAIBI** and a person known as "Alex."[4]  Both men claimed
to be former Army Intelligence Officers for Yemen.  "Alex" also
told the CW that he supports the terrorist group Hezbollah.

24.  On December 15, 2005, at approximately 9:15 a.m., the CW
met with the ICE Special Agent Braisted and your affiant at a
Rochester hotel, and provided him with $9,000.  The CW also was
fitted with a digital recording device and a transmitter.  At
approximately 11:15 a.m., the CW entered **SAEED**'s store.  While at
the store, the CW met with **SAEED** and **ALOMARI** and all three counted
out the $9,000 in United States currency.  The $9,000 was to be
broken down as follows: $5,000 was to be exchanged for the $5,000
**ALOMARI** would make available through **ALOMARI**'s bank account in
Yemen.  Approximately $3,200 was to be transferred to Yemen via
**ALOMARI**'s Bank of America account in Rochester, NY.  The remaining
$800 was to be used to cover the commission, bank transfer and or
wire fees, and any expenses for **SAEED**'s brother-in-law in Yemen.

25.  On December 16, 2005, the CW, while fitted with a digital
recording device, met again with **SAEED** and **ALOMARI** at **SAEED**'s
store.  The CW asked **ALOMARI** if he would go with the CW to

---

[4]The true identity of "Alex" will not be identified as he is not a
named defendant in the Criminal Complaint.

-14-

ALOMARI's bank (Bank of America) and attempt to transfer the $3,200 in United States currency, while the CW was still in town. ALOMARI agreed to this. While ALOMARI and the CW were driving to and from the bank, the CW informed ALOMARI the CW could not send the money himself, because he received the money "from credit card fraud . . . from you know, green card . . . from you know, food stamps[.]"[5] ALOMARI thereafter informed the CW he would be interested in doing more business with the CW. Additionally, ALOMARI informed the CW, if the CW was willing to travel to California, ALOMARI could send even more money through a contact ALOMARI has there.

26. The $20,000 transfer was broken down as follows: (1) $9,950 cash converted into bank checks and money orders by SAEED; (2) $5,000 cash exchanged by ALOMARI for $5,000 already in Yemen; (3) $3,200 cash sent via ALOMARI's Bank of America account, which is addressed to 281 Carter Street, Rochester; (4) $1,000 paid to SAEED for arranging this transfer, as well as the August transfer; (5) $450 cash paid to ALOMARI as payment for transferring $8,200; (6) $300 cash paid to SAEED's brother-in-law to transport money; and (7) $100 cash paid to cover any bank transfer/wire fees.

---

[5]This is a quote from a draft of the English transcript of the Arabic conversation.

-15-

27.   The Bank of Arab records in Lebanon indicate the following deposits were made into the undercover account: (1) on December 23, 2005, $4,964.99 was received into the account; (2) on December 26, 2005, $3,196.99 was received into the account; and (3) on January 23, 2006, the final payment of $9,764.99 was received into the account.   Based on statements made by **SAEED**, your affiant believes both deposits of $4,964.99 and $9,764.99 were facilitated by **SAEED**'s brother-in-law via a wire transfer from the Bank of Arab in Yemen to another Bank of Arab branch located in Lebanon.

**C.    Introduction of Undercover Agent**

28.   Based on statements made in December 2005 by **SAEED**'s associates regarding their support for Hezbollah, your affiant decided to insert an Undercover Agent (hereinafter, "UCA") into this investigation.   The UCA is a certified Undercover Agent, as well as a Senior Special Agent with Immigration and Customs Enforcement (ICE).   The UCA was born in Lebanon and speaks fluent Arabic.    The UCA introduced himself to the subjects of the investigation as a Hezbollah member.

29.   On May 19, 2006, at approximately 11:30 a.m., the CW and the UCA met with **SAEED** and **ALOMARI** at **SAEED**'s store.   This information is based on statements made by the CW and UCA following

-16-

the meeting. During the meeting, **ALOMARI** informed both the CW and the UCA that **ALOMARI** could send $100,000 to Yemen. **ALOMARI** stated he has a contact in California who can send approximately $20,000 to Yemen every other day. **SAEED** informed the CW and UCA he could send approximately $10,000 at a time via DHL delivery service from Rochester, NY to Yemen. Additionally, the CW and UCA discussed selling fraudulent green cards and parole letters to **SAEED** and **ALOMARI**. The CW and UCA informed **SAEED** and **ALOMARI** the going price for the green card was $9,000 and the parole letter was $4,500. Both **SAEED** and **ALOMARI** were interested and wanted to discuss this more with their friends. The CW and UCA then departed and informed **SAEED** and **ALOMARI** they would see them later in the evening to visit again.

30.   On May 19, 2006, at approximately 11:25 p.m., the CW and the UCA entered **SAEED**'s store. Prior to going to the store, both the CW and the UCA were fitted with authorized recorders and transmitters. Once inside of the store, the UCA and CW met with **AL HURAIBI**, "Alex," **ALOMARI** and **SAEED**. During the meeting, the parties spoke about Hezbollah, as well as the situation in the Middle East. **SAEED** and **ALOMARI** continued similar discussions heard   earlier   in   the   day   relating   to   money   laundering.

-17-

Additionally, more discussions were held regarding the possible purchase of fraudulent immigration documents.

**D.    Establishment of New Undercover Account & Transfer of $60,000 in August 2006**

31.  On August 1, 2006, an undercover bank account (hereinafter, "undercover account") was successfully established in Bahrain.   The sole purpose of this account was to create an overseas account for use in criminal investigations.   Furthermore, once the monies were received in the account in Bahrain, it could be withdrawn by ICE and utilized again.

32.  On July 26, 2006, the CW telephoned **SAEED**, and informed **SAEED** the CW wanted to transfer several thousands of dollars from the United States to Lebanon.  The CW asked **SAEED** if **SAEED** could facilitate this transfer, possibly with the help of **ALOMARI** and others.

33.  On August 14, 2006, at approximately 10:40 p.m., the CW and UCA met with **SAEED, ALOMARI** and **AL HURAIBI** at a hotel room located in Rochester, NY.  The hotel room where the meeting took place was wired for audio and video recording.   Toward the beginning of the meeting, **AL HURAIBI** stated they were celebrating

-18-

the victory of Hezbollah that night.[6]  **ALOMARI** retorted that they should stop talking about terrorists.  The UCA replied to **ALOMARI's** comment by stating that Hezbollah is not a terrorist group, but a freedom fighters group.  Later in the evening, the CW and the UCA handed over approximately $60,000 in United States currency to **SAEED, ALOMARI** and **AL HURAIBI**.  The CW and UCA informed **SAEED, ALOMARI** and **AL HURAIBI** that this money was intended to go to Lebanon for the purpose of helping their families, and assisting Hezbollah in rebuilding Lebanon.  **SAEED** along with the CW and UCA counted the money, which was then divided evenly among the three men.  **SAEED, ALOMARI** and **AL HURAIBI** were instructed to keep $1,000 (5% of the $20,000) as payment for their services.  Additionally, **SAEED** was paid an additional $1,000 for ensuring all the money was promptly sent overseas.  The CW and UCA informed **SAEED, ALOMARI** and **AL HURAIBI** they would contact them the following day and provide them with the Bahraini bank account information to facilitate the transfer of the money out of the United States.

34.  On August 15, 2006, the CW and UCA met with **SAEED** and **ALOMARI** outside of **SAEED's** store.  The purpose of this meeting was

---

[6]On August 14, 2006 at 8:00 a.m., a United Nations negotiated cease-fire between Israel and Hezbollah went into effect.  This cease-fire agreement ended a month-long conflict between Israel and Hezbollah.

-19-

to ensure that the subjects had arrived home safely with the money. The CW and UCA discussed the bank account information with **SAEED** and **ALOMARI**, and then thanked them for helping get the money overseas.   The CW and UCA again informed **SAEED** and **ALOMARI** that part of the money was going to help their families and part of it was intended to help rebuild Hezbollah.  After this meeting, the CW and UCA met with **AL HURAIBI** at his store located at 651 Jefferson Avenue, Rochester, NY.  During this meeting, the CW and UCA advised **AL HURAIBI** that Hezbollah appreciates **AL HURAIBI**'s assistance in sending the money.

35.  According to subpoenaed bank records, on or about August 15, 2006, **AL HURAIBI** deposited $12,000 into his Chase Bank account. At the time of the deposit, **AL HURAIBI** claimed that the money related to his business, Mojo Stars.  On or about August 21, 2006, $11,800 was wire transferred to the undercover account in Bahrain. On August 16, 2006, **AL HURAIBI** deposited $7,500 into his ESL Federal Credit Union account, and immediately wired $7,200 to the undercover account in Bahrain.

36.  In addition to **AL HURAIBI**'s deposits discussed above, the undercover account bank records show the following other deposits: (1) on September 21, 2006, a deposit of $18,968 was received, which

-20-

your affiant believes was sent into the account by **ALOMARI** through

another person; (2) on September 27, 2006, a deposit of $15,485 was

received, which was sent by **SAEED** through a Citizens Bank

account[7]; (3) on October 10, 2006 a deposit of $1,975 was received,

which was sent by **SAEED** through one of his Citizens Bank accounts;

and (4) on October 17, 2006, a deposit of $1,475 was received,

which was sent by **SAEED** through one of his Citizens Bank accounts.

Of the original $60,000, approximately $57,000 was expected to be

deposited (minus banking and wire transfer fees) into the

undercover account.    A total of $56,861 was received in the

undercover bank account in Bahrain.


**E.    November 2006 - Transfer of $30,000 in Rochester and $60,000
        in California**

        37.   On November 9, 2006, another undercover operation took

place at a hotel room located in Rochester, NY.    The CW, UCA,

**ALOMARI** and **AL HURAIBI** were present at this meeting, which was

---

[7]Citizens Bank records show that on September 20, 2006, **SAEED**
deposited $15,500 into two separate Citizens Bank accounts.    One
Citizens bank account (account 1307 - "Durnan Mini Market Lotto"
account) received $7,500 and the other account (1006) received
$8,000.    On September 21, 2006, $2,100 was  withdrawn from account
1307 (the "Durnan Mini Market Lotto" account).    On September 25,
2006, $2,000 was deposited into account 1006.    On September 22,
2006, **SAEED** transferred $5,500 from account 1307 (the "Durnan Mini
Market Lotto" account) into account 1006.    On September 26, 2006,
**SAEED** wired $15,500 from account 1006 to the undercover account in
Bahrain.

-21-

monitored by federal agents.   The purpose of the meeting was to transfer approximately $30,000 through **ALOMARI** and **AL HURAIBI** ($15,000 each) to the undercover account.  During this meeting the CW and UCA again informed **ALOMARI** and **AL HURAIBI** the money was intended for Hezbollah in Lebanon.   The UCA explained to **ALOMARI** and **AL HURAIBI** that their contacts at Hezbollah provide the UCA and CW with stolen property, counterfeit goods and prescription drugs, which they (UCA and CW) sell at a considerable profit.[8]   The UCA further explained that he and the CW then take their cut and send the remaining amount back to Hezbollah. At this meeting, **ALOMARI** and **AL HURAIBI** indicated they wanted to be paid more money than the last time (August 5%).  They eventually agreed to be paid 8% of the amount being sent overseas, plus a bonus of $700.00, if the money arrived quickly.

38.   At the request of the CW, **ALOMARI** had made arrangements with a family friend located near Fresno, California to transfer

---

[8]Title 18, United States Code, Section 2320 provides, in part:

> Whoever intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services [shall be guilty of a crime].

In addition, Title 21, United States Code, Section 841 prohibits the unlawful distribution and manufacturing of prescription drugs.

additional money for the CW and the UCA. **ALOMARI** informed the CW that **ALOMARI**'s California contact can easily transfer large amounts of currency out of the United States. In exchange for facilitating the relationship between **ALOMARI**'s California contact and the CW and the UCA, **ALOMARI** wanted to be paid a percentage of the money sent by the CW and UCA through **ALOMARI**'s California contact.

39. On November 11, 2006 another undercover operation took place in a hotel in Fresno, CA. Present at this meeting was the CW, UCA, **ALOMARI**'s California contact and the California contact's bookkeeper. The purpose of the meeting was to give approximately $60,000 in United States currency to **ALOMARI**'s California contact, and have the California contact transfer the money out of the United States to the undercover account in Bahrain. The UCA informed **ALOMARI**'s California contact that their main client is Hezbollah, and that the UCA is acting as a broker/middleman for Hezbollah. The UCA explained to **ALOMARI**'s California contact that the CW and UCA's contacts at Hezbollah provide the UCA and CW with stolen property, counterfeit goods and prescription drugs, which they (UCA and CW) sell at a considerable profit. The UCA further explained that he and the CW then take their cut and send the remaining amount back to Hezbollah to help rebuild in the aftermath of the war with Israel. At this meeting **ALOMARI**'s California

-23-

contact agreed to be paid 6% of the amount being sent ($60,000) as
his fee.  The UCA removed six packs of bundled US currency from a
"GAP" bag.  Each bundle contained $10,000.  After a short period of
time the bundles were repacked in the GAP bag and handed to
**ALOMARI**'s California contact.  Both the California contact and his
bookkeeper expressed their desire for a long relationship.
**ALOMARI**'s California contact was encouraged to bypass his contact
in Yemen and send the money via bank wire directly from the United
States to the account in Bahrain, which would in turn provide him
more money as he would not have to pay a percentage to his contact
in Yemen.  **ALOMARI**'s California contact stated he would consider
it.  **ALOMARI**'s California contact was then observed and
photographed departing the hotel area carrying the GAP bag.

40.  On November 13, 2006, **ALOMARI**'s California contact
telephoned the CW and requested to be paid 10%, as opposed to the
6% originally agreed to, because the California contact intended to
send the money by direct wire transfer from the United States to
the bank account in Bahrain.  The CW eventually agreed to the
increased commission requested by **ALOMARI**'s California contact.

41.  The undercover account established in Bahrain received
the following deposits in November 2006: (1) on November 13, 2006,

a deposit of $4,742.59 was received, which was sent by **ALOMARI** through his Bank of America savings account, which is addressed to 281 Carter Street, Rochester; (2) on November 15, 2006, a deposit of $8,438 was received, which was sent by **AL HURAIBI** through his Chase Bank account; (3) on November 16, 2006, a deposit of $5,128.50 was received, which was sent by **AL HURAIBI** through his ESL Credit Union account; (4) on November 21, 2006, a deposit of $8,700 was received, which was sent by **ALOMARI** through his Short Deli and Grocery Bank of America checking account; (5) on November 22, 2006, a deposit of $24,988 was received, which was sent by **ALOMARI**'s California contact; and (6) On November 28, 2006, a deposit of $29,990 was received, which was sent by **ALOMARI**'s California contact. A total of approximately $81,400 (minus bank and transfer fees) was expected, and approximately $81,987.09 was received.

**F.    February 2007 - Transfer of $20,000 In Rochester and $80,000 in California to Subjects**

42.   On Saturday, February 17, 2007, the CW and UCA met with **ALOMARI** and **AL HURAIBI** at **PREMISES 2** for the purpose of transferring $20,000 out of the United States to the undercover account. At the time **ALOMARI** and **AL HURAIBI** took possession of the $20,000, they were again advised that the money was proceeds of

various fraudulent activity.   Furthermore, the CW and the UCA advised **ALOMARI** and **AL HURAIBI** that the $20,000 would be utilized by Hezbollah in Lebanon to re-arm and purchase military goods.   In exchange for transferring the money, **ALOMARI** and **AL HURAIBI** were paid a fee of 15%.

43.   On Sunday, February 18, 2007, the CW and UCA met with **ALOMARI**'s California contact at a hotel room in Fresno, California, which was pre-wired to capture audio and video.   Again, the CW and UCA advised **ALOMARI**'s California contact the $80,000 to be transferred was proceeds of various fraudulent schemes.   They further advised **ALOMARI**'s California contact that the money was being sent to Hezbollah to purchase weapons.   In exchange for transferring the money, **ALOMARI**'s California contact was paid a fee of 12%.  **ALOMARI**'s California contact was also told that Hezbollah was extremely happy with the $60,000 he sent in November 2006.   In addition, the CW previously agreed to pay **ALOMARI** for each money transfer he conducted with **ALOMARI**'s California contact.   At the conclusion of this meeting, the CW and UCA gave the $80,000 in a paper bag to **ALOMARI**'s California contact with the understanding that he (**ALOMARI**'s California contact) would forward that money (minus his commission of 12%) to the undercover account in Bahrain. The CW escorted **ALOMARI**'s California contact, who was carrying the

paper bag containing the $80,000, from the hotel room to the hotel parking lot after the meeting. Federal agents also observed ALOMARI's California contact exit the hotel carrying the paper bag.

### G. Expected Departure of ALOMARI

44. On Thursday, February 22, 2007, law enforcement learned ALOMARI purchased airline tickets on or about February 20, 2007. According to ticketing information, ALOMARI is departing from JFK airport on Sunday, February 25, 2007 and traveling to Yemen via Jordan.

45. As of February 22, 2007, none of the monies provided to ALOMARI, AL HURAIBI or ALOMARI's California contact on February 17 and 18, 2007, has been deposited into the undercover account. As such, the $100,000 provided to ALOMARI, AL HURAIBI and ALOMARI's California contact is presently unaccounted for.

46. On February 23, 2007, a Special Agent with ICE observed ALOMARI working inside of SAEED's store.

47. Based on the foregoing information, I submit that there is probable cause to believe that SAEED, ALOMARI and AL HURAIBI have violated Title 18, United States Code, Section 1956(h). Also

-27-

based upon the foregoing information, I request that a complaint and arrest warrants be issued for **SAEED, ALOMARI** and **AL HURAIBI** for this violation.

### III.   REQUEST FOR SEALING

48.   Since this investigation is continuing, disclosure of the complaint and this affidavit will jeopardize the progress of the investigation.   Accordingly, I request that the Court issue an order that the complaint and affidavit be filed under seal until further order of this Court.

JAMES K. CRAWFORD

Sworn and subscribed to before me

this __24__ day of February, 2007.

MARIAN W. PAYSON
UNITED STATES MAGISTRATE JUDGE

-28-