Case 1:06-cr-00321-OWW   Document 46-1   Filed 04/25/08   Page 1 of 31

# United States District Court

**ORIGINAL FILED**

FEB 2 6 2007

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
                    DEPUTY CLERK

____EASTERN____ DISTRICT OF ____CALIFORNIA____

In the Matter of the Seizure of

(Address or brief description of property or premises to be seized)

**All funds in Bank of the West Account Number 706-022456 held in the name of Abdulla Q. Ahmed, DBA Abdulla's International Transfer, 2749 Whitley Avenue, Corcoran, California 93212.**

## APPLICATION AND AFFIDAVIT FOR SEIZURE WARRANT

**1: 07M00034 UO**

**CASE NUMBER:**

I ___Brad L. Lehr, Task Force Agent, FBI___ being duly sworn depose and say:

I am a(n) ___Brad L. Lehr, Task Force Agent, FBI___ and have reason to believe

that in the **EASTERN** District of **CALIFORNIA**

there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

All funds in Bank of the West Account Number 706-022456 held in the name of Abdulla Q. Ahmed, DBA Abdulla's International Transfer, 2749 Whitley Avenue, Corcoran, California 93212

which is (state one or more bases for seizure under the United States Code)

subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A), 981(a)(1)(C) and 984 and subject to seizure pursuant to 18 U.S.C. § 981(b).

concerning a violation of Title      United States Code, Section(s)

| Title | Section |
|-------|---------|
| 18 | 1956 |
| 18 | 2342 |
| 18 | 1960 |

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

See attached affidavit.

Continued on the attached sheet and made a part    [X] Yes    [ ] No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

___Feb 24, 2007___
Date

at   Fresno, California
    City and State

Lawrence J. O'Neill, U.S. District Court Judge
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANT

I, Brad L. Lehr, a duly appointed Task Force Officer with the Federal Bureau of

Investigation (FBI), Joint Terrorism Task Force (JTTF), Sacramento Division, Fresno Resident

Agency, being duly sworn depose and state as follows to wit:

1.    I am a California Highway Patrol Investigator presently assigned as a JTTF

Officer with the Federal Bureau of Investigation (FBI), and I have been assigned to this position

for approximately four and a half years. I have been a California law enforcement officer for

twenty years, and I am currently a deputized federal law enforcement officer and, as such, I have

been empowered to conduct investigations of, and to make arrests for, offenses enumerated in

Title 18 of the United States Code. As part of my duties, I have investigated and/or assisted with

cases that involve possible terrorist connections and white collar criminal matters, to include

mail fraud, wire fraud, money laundering, illegal money transmitting, contraband or counterfeit

cigarettes, fraudulent cigarette tax stamps, and fraud against the government.

2.    This affidavit is being submitted in support of civil seizure warrants for the items

listed below:

a. All money, negotiable instruments, securities, or other things of value traceable

to the subject's violations found in his residence located at 2749 Whitley Avenue, Corcoran,

California 93212.

b. All money, negotiable instruments, securities, or other things of value traceable

to the subject's violations found in the Ranchito Market located at 2749 Whitley Avenue,

Corcoran, California 93212.

c. All money, negotiable instruments, securities, or other things of value traceable

1

to the subject's violations found in the Ranchito Market #2 located at 2838 Waukena Drive, Tulare, California 93274.

d.  All funds in Bank of the West Account Number 706-025970 held in the name of Abdulla Q. Ahmed, Doing Business As (dba) Ranchito Market, 2749 Whitley Avenue, Corcoran, California 93212.

e.  All funds in Bank of the West Account Number 706-023710 held in the name of Abdulla Q. Ahmed, dba Ranchito Market Lottery Account, 2749 Whitley Avenue, Corcoran, California 93212.

f.  All funds in Bank of the West Account Number 706-001633 held in the name of Abdulla Q. Ahmed, dba Abdulla's Ranchito Market #2, 2749 Whitley Avenue, Corcoran, California 93212.

g.  All funds in Bank of the West Account Number 706-022456 held in the name of Abdulla Q. Ahmed, dba Abdulla's International Transfer, 2749 Whitley Avenue, Corcoran, California 93212.

h.  All funds in Bank of the West Account Number 706-257524 held in the name of Abdulla O. Ahmed, 2749 Whitley Avenue, Corcoran, California 93212.

i.  All funds in Bank of the West Account Number 706-000-850633 held in the name of Abdulla Q. Ahmed, dba Ranchito MKT, 2749 Whitley Avenue, Corcoran, California 93212.

j.  All funds held in any Bank of the West Account in the name of Abdulla Qassem Ahmed Muthana, a.k.a. Abdulla Q. Ahmed, Abdulla Qassem Ahmed, Abdulla Kasem Ahmed Muthana or Abdulla Kesem Ahmed.

3.     The information contained in this declaration is based on my experience and background as an FBI JTTF Task Force Officer, my personal observations, and information provided by confidential informant and other federal, state and local law enforcement officers and employees during the course of this investigation.

4.     The items and/or articles of personal property listed above are owned and controlled by or were purchased, or were caused to be purchased, by Abdulla Qassem Ahmed Muthana, a.k.a. Abdulla Q. Ahmed, Abdulla Qassem Ahmed, Abdulla Kasem Ahmed Muthana, Abdulla Kesem Ahmed (and several variations thereof) ("Muthana") and are traceable to or were purchased with the proceeds from illegal activities and are subject to seizure and civil forfeiture pursuant to Title 18 U.S.C. §§ 981(a)(1)(A)(civil forfeiture of the proceeds of specified unlawful activities) and 984 (civil forfeiture of fungible property).

5.     Muthana conducted or attempted to conduct a number of financial transactions using proceeds of a specified unlawful activity with the intent to promote a specified unlawful activity or to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds, a violation set forth in Title 18 U.S.C. § 1956(a)(3)(money laundering).  Any and all real or personal property involved in a Title 18 U.S.C. § 1956(a)(3)(money laundering) violation is subject to seizure and civil forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(A)(civil forfeiture of property involved in a money laundering transaction).

6.     Some of the specific underlying Federal Statutes that govern the facts developed during this investigation are one or more of the following:

a.     It is unlawful for anyone to conduct or attempt to conduct a financial transaction knowing that the property involved in the financial transaction represents proceeds of an

3

unlawful activity, which in fact involves proceeds of a specified unlawful activity, with the intent

to promote the carrying on of a specified unlawful activity or to conceal or disguise the nature,

the location, the source, the ownership, or the control of the proceeds as set forth in Title 18

U.S.C. § 1956 (money laundering).

      b.      It is a crime for any person knowingly to ship, transport, receive, possess, sell,

distribute, or purchase contraband cigarettes pursuant to 18 U.S.C. § 2342 (contraband cigarette

trafficking).  The term "contraband cigarettes" means a quantity in excess of 10,000 cigarettes

which bear no evidence of the payment of applicable State cigarette taxes in the State where such

cigarettes are found as established in 18 U.S.C. § 2341.

      c.      It is a crime to knowingly conduct an illegal money transmitting business.  Under

Title 18 U.S.C. Section 1960(b)(1) the term "unlicensed money transmitting business" means a

money transmitting business which affects interstate or foreign commerce in any manner and: (a)

is operated without an appropriate money transmitting license in the State where such unlicensed

operation is punishable as a misdemeanor or felony under State law (whether or not the

defendant knew the operation was required to be licensed or that the operation was so

punishable); (b) fails to comply with federal money transmitting business registration

requirements under section 5330 of Title 31, United States Code; or (c) involves the

transportation or transmission of funds known to have been derived from a criminal offense or

are intended to be used to provide or support unlawful activity.  Under California law money

transmitting businesses are regulated by the Department of Financial Institutions.  Pursuant to

section 1800.3 of the California Financial Code no person may engage in the business of

receiving money for the purpose of transmitting the same or its equivalent to foreign countries

4

without first obtaining a license. Failure to comply with the licensing requirement is punishable as a misdemeanor or a felony under Section 1823 of the California Financial Code.

7. Based on my training and experience, as well as the experience of the law enforcement officers assisting in the investigation, I know that:

a. Individuals involved in money laundering, and distribution of contraband or counterfeit cigarettes generate large amounts of United States currency. These individuals attempt to conceal substantial portions of their earnings from these illegal activities from the Internal Revenue Service and other governmental authorities. One of the methods used to disguise the illegal proceeds is to deposit them into a bank account maintained in the name of a legitimate business or a third party.

b. Individuals involved in the sale and distribution of contraband or counterfeit cigarettes often sell these items from a legitimate business (local convenience store). They will combine the legal cigarettes with the contraband or counterfeit cigarettes. In addition, these individuals use apparently legitimate business to sell and distribute illegal products.

c. Individuals involved in the sale and distribution of contraband or counterfeit cigarettes often use code names for the products and false identities or identifiers to isolate themselves from discovery and/or identification by law enforcement officers.

d. Individuals involved in money laundering and distribution of contraband or counterfeit cigarettes attempt to legitimize and hide their illegal profits by intermingling these funds, or "dirty money", with legitimate funds earned from a legal business. Additionally, business records are frequently falsified in an attempt to legitimize the proceeds. These records are normally found at either the individual's place of business or residence.

5

e.      Individuals involved in money laundering and distribution of contraband or

counterfeit cigarettes commonly retain records of their financial transactions, to include, but not

limited to, bank statements, cancelled checks, log books, journals, cashier's check receipts,

money order receipts, titles, deeds, automobile registrations, rental car receipts, and sale orders at

their businesses and/or residence locations. These records are often retained for a number of

years.

f.      Individuals involved in money laundering and distribution of contraband or

counterfeit cigarettes often store records, documents, and the proceeds of their illegal activities in

the living areas of their residences, in the attic, and in the crawl space or basement. Proceeds

traceable to motor vehicles or other large assets and voluminous paper records and documents

are frequently stored in garages located at their residence and/or business to be easily accessible

but concealed from visitors.

8.      Muthana is a permanent resident alien and resides in Corcoran, California.

9.      Muthana is a native of the Republic of Yemen and has been in the United States

since January 1991.

10.      Muthana is the owner of record for the Ranchito Market, 2749 Whitley Avenue,

Corcoran, California, and the Ranchito Market II, 2838 Waukena Drive, Tulare, California.

**FACTS ESTABLISHING PROBABLE CAUSE**

11.      A Confidential Witness (CW) provided information regarding Muthana's

numerous criminal activities, to include knowingly cashing fraudulent EDD benefit checks for a

fee. In March 2005, the Fresno JTTF initiated a check sting/money laundering operation focused

on Abdulla Muthana.

6

1.      EDD Fraud

12.     The Social Security Act of 1935 (the "Act") initiated the Federal and State

Unemployment insurance system, which is designed to provide benefits to persons out of work

through no fault of their own.  The purpose of the Act is to lessen the effects of unemployment

through payments made directly to laid-off workers, insuring that at least a significant portion of

the necessities of life, most notably food, shelter, and clothing, can be met on a weekly basis

while the worker seeks employment.  The unemployment insurance (UI) program is administered

for the federal government by the State Workforce Agencies in each State.  In California, the

state agency is the California Employment Development Department (EDD).

13.     During an undercover law enforcement operation, it was represented to Muthana

that the EDD checks had been obtained from the State of California through fraudulent means

and had been transmitted through the United States Mail.  Muthana agreed to promote the

fraudulent scheme, and conceal the proceeds thereof, by receiving the EDD checks, depositing

them into the Ranchito Market checking account at the Bank of the West, and then delivering

cash to the persons who represented the checks as fraudulent and identified themselves as the

perpetrators of the fraud.  For this service, Muthana demanded and received a cash commission

payment for each transaction he performed involving an EDD check.

14.     Between September 28, 2005, and January 12, 2006, Muthana received a total of

324 EDD checks with a face value totaling $209,130.00 from a law enforcement officer and a

person acting at the direction, and with the approval of a law enforcement officer.  For the

service of exchanging cash for these checks, Muthana demanded and received a total payment of

$16, 940.00.  Muthana received approximately 8.1 % of the total amount laundered for this

7

service.

15.     Through a series of consensually recorded conversations with the Cooperating

Witness, Muthana agreed to cash what he believed to be unlawfully obtained State of California

unemployment checks for a negotiated fee. Through an agreement established with the United

States Department of Labor (DOL) and the California EDD, FBI/JTTF agents were provided

with valid EDD checks to be used for the operation.

16.     United States Department of Labor Special Agent (SA) Jesse Quezada created a

database of fictitious payees and generated valid unemployment checks through the State of

California Employment Development Department for the operation. JTTF Officer Brad Lehr

generated twenty-five (25) fictitious California Drivers License numbers (CDL) that were

randomly placed on the 324 EDD checks used during the operation.

17.     On September 28, 2005, a State of California Department of Justice agent, acting

in an undercover capacity (UCA), posed as the producer of the EDD checks and provided the

initial batch of fifty-eight (58) checks to Muthana, totaling $36,984.00. Muthana agreed to cash

the checks for a fee of $50.00 per check and subsequently cashed them through a series of

deposits into the Ranchito Market business account.

18.     The fifty-eight (58) checks were deposited into the Ranchito Market business

account held at the Bank of the West, account number 706-025970, on the following dates:

September 29, 2005, 14 checks; September 30, 2005, 12 checks; October 3, 2005, 16 checks;

October 5, 2005, 8 checks; October 7, 2005, 4 checks; and October 11, 2005, 4 checks.

19.     During the first meeting, which was a consensually monitored conversation, the

Undercover Agent advised Muthana that his checks were "right off the factory" and tells

8

Muthana that he (UCA) has a relative that works on the inside. The Undercover Agent explained

to Muthana not to cash too many checks per day because the banks will start to ask questions.

Muthana replied, "Oh yeah, yeah, no, I have to take care of my business too." The Undercover

Agent advises Muthana to mix the checks in with his regular business checks so that there is no

suspicion, and Muthana agreed.

20.     The Undercover Agent stated he was told that Muthana wanted drivers license

numbers and signatures on each check and Muthana replied, "Yeah, yeah, the deal was, but now

they need the fingerprint." Muthana advises he needed them (fingerprints) for the bank so that

there were no problems. The Cooperating Witness advised the Undercover Agent that the

Cooperating Witness had previously explained to Muthana that for the first batch of checks they

(CW and Muthana) would handle the fingerprints themselves. It was then agreed to that for the

future checks, fingerprints would be provided by the Undercover Agent.

21.     The Undercover Agent asked Muthana if he could handle large amounts of checks

every two weeks. Muthana said yes, but indicated that he could only put them through the bank

in small numbers per day. The Undercover Agent informed Muthana that the relative working

inside mails the checks out every two weeks and his nephew (JTTF Agent) picked the checks up

at various post office boxes. Muthana advised that he could handle the checks, but reiterates that

he would need fingerprints on all future checks. The Undercover Agent discussed that they

needed to have trust in one another and Muthana replied, "We have to stick together." The

Undercover Agent advised Muthana that if the cops ever came and ask about the checks,

Muthana was only to reply that he (Muthana) checked for licenses and signatures and that he had

done his part.

22.     On October 4, 2005, during a consensually monitored conversation, the Cooperating Witness advised Muthana that he had talked to his friend (JTTF Agent) about being paid more money for cashing the EDD checks. The Cooperating Witness stated he told the friend (JTTF Agent) that Muthana had previously cashed checks for guys in Selma, California, for a fee of $25.00 per check, and that the checks were in smaller amounts. Muthana agreed that the checks were smaller and added that it was a long time ago and now he (Muthana) was being charged more by the bank. The Cooperating Witness stated that the friend (JTTF Agent) had talked to his uncle (UCA), and he (UCA) was unwilling to pay more for cashing the checks.

23.     The Cooperating Witness informed Muthana that the Undercover Agent had told his friend (JTTF Agent) that the money made from the checks had to be split between many people. The Undercover Agent also had to pay off the girl working in the office who made the checks, the guys who picked up the checks, and people to sign and place fingerprints on the checks. The Undercover Agent had told the CW's friend (JTTF Agent) that he (UCA) could not pay more unless they (Muthana and the CW) were willing to do more of the work. Muthana asked the Cooperating Witness what kind of work they could do and the Cooperating Witness advised that maybe they could pick up the checks, sign them and/or place fingerprints on them. Muthana told the Cooperating Witness that if they were going to do all that work, he (Muthana) would want $150.00 per check. Muthana also questioned how they (Muthana and the CW) would pick up the checks and the Cooperating Witness stated that maybe the friend (JTTF Agent) would give them the post office box keys. Muthana stated that placing signatures and fingerprints on the checks would be dangerous and could cause too many problems. Muthana advised that when he had placed his fingerprints on the checks a couple of days prior, he

10

(Muthana) was scared. Muthana thought more about the issue and finally stated, "Just see if you can get them to pay $65.00 per check."

24.     On October 12, 2005, Fresno JTTF Special Agent Frank Navarro, Special Agent Gerald Menoni, and EDD Criminal Investigator Antonio Cabrera Jr. met with the Cooperating Witness, in Corcoran, California, to recover the balance from the check cashing transaction. The Cooperating Witness arrived at the meeting location carrying a black plastic bag which he/she advised contained $34,084.00 in cash. The Cooperating Witness advised that Muthana kept $2,900.00 as his fee for cashing the checks. The money was removed from the bag, counted in the presence of the above agents and the total amount was confirmed.

25.     On November 15, 2005, United State Department of Labor Special Agent Jesse Quezada provided JTTF Special Agent Frank Navarro with one hundred and eight (108)EDD checks. JTTF Special Agent Navarro, with the assistance of FBI Special Agent Gerald Menoni, FBI Special Agent Glen Bartolomei, FBI Special Agent Jacqueline Neumann and JTTF Detective Sheila Chandler signed each of the checks in the respective payee's names, placed fingerprints, and previously obtained CDL identification numbers on the face of each check.

26.     On November 16, 2005, the Cooperating Witness provided Muthana with the second batch of one hundred and eight (108) EDD checks, totaling $69,980.00. Muthana again agreed to cash the checks for a fee of $50.00 per check and subsequently cashed them through a series of deposits into the Ranchito Market business account.

27.     The one hundred and eight (108) checks were deposited into the Ranchito Market business account held at the Bank of the West, account number 706-025970, on the following dates: November 17, 2005, 20 checks; November 21, 2005, 25 checks; November 23, 2005, 8

11

checks; November 25, 2005, 22 checks; November 28, 2005, 15 checks; December 1, 2005, 10 checks; and December 2, 2005, 8 checks.

28.     On December 8, 2005, Fresno JTTF Special Agent Frank Navarro, Special Agent Gerald Menoni, EDD Criminal Investigator Antonio Cabrera Jr. and United States Department of Labor Special Agent Jesse Quezada met with the Cooperating Witness in Tulare, California, in order to recover the balance from the check cashing transaction. The Cooperating Witness arrived at the meeting location in possession of a white plastic bag which contained $64,580.00 in cash. The Cooperating Witness advised that Muthana kept $5,400.00 as his fee for cashing the checks. The money was removed from the bag, counted in the presence of the above agents and the total amount was confirmed.

29.     On December 9, 2005, United States Department of Labor Special Agent Jesse Quezada provided JTTF Special Agent Frank Navarro with eighty-four (84) EDD checks. JTTF Special Agent Frank Navarro, with the assistance of FBI Special Agent Gerald Menoni, Department of Labor Special Agent Jesse Quezada and EDD Criminal Investigator Antonio Cabrera Jr. signed each of the checks in the respective payee's names, placed fingerprints, and previously obtained CDL identification numbers on the face of each check.

30.     On December 9, 2005, the Cooperating Witness provided Muthana with the third batch of eighty-four (84) EDD checks, totaling $53,430.00. Muthana agreed to continue to cash the checks for a fee of $50.00 per check and subsequently cashed them through a series of deposits into the Ranchito market business account.

31.     Sixty-nine (69) of the eighty-four (84) checks were deposited into the Ranchito Market business account held at the Bank of the West, account number 706-025970, prior to the

12

fourth and final batch of EDD checks delivered on December 22, 2005.  The sixty-nine (69) checks were deposited on the following dates:  December 10, 2005, 1 check; December 12, 2005, 10 checks; December 14, 2005, 11 checks; December 16, 2005, 10 checks; December 19, 2005, 19 checks; and December 22 2005, 13 checks.

32.     On December 22, 2005, Fresno JTTF Special Agent Frank Navarro, EDD Criminal Investigator Antonio Cabrera Jr. and United States Department of Labor Special Agent Jesse Quezada met with the Cooperating Witness in Corcoran, California, to recover the balance from the check cashing transaction.  The Cooperating Witness arrived at the meeting location in possession of a white plastic bag which contained $49,230.00 in cash.  The Cooperating Witness advised that Muthana kept $4,200.00 as his fee for cashing the checks.  The money was removed from the bag, counted in the presence of the above agents and the total amount was confirmed.

33.     On December 22, 2005, United States Department of Labor Special Agent Jesse Quezada provided JTTF Special Agent Frank Navarro with the final group of seventy-four (74) EDD checks.  JTTF Special Agent Frank Navarro, with the assistance of Special Agent Jesse Quezada and EDD Criminal Investigator Antonio Cabrera Jr. signed each of the checks in the respective payee's names, placed fingerprints, and previously obtained CDL identification numbers on the face of each check.

34.   ·  December 22, 2005, the Cooperating Witness provided Muthana with the fourth and final batch of seventy-four (74) EDD checks, totaling $48,736.00.  Muthana agreed to cash the checks for an increased fee of $60.00 per check and subsequently cashed them through a series of deposits into the Ranchito Market business account.

35.     The remaining eighty-nine (89) were deposited into the Ranchito Market business

account held at the Bank of the West, account number 706-025970, on the following dates:

December 23, 2005, 10 checks; December 27, 2005, 19 checks; December 30, 2005, 20 checks;

January 3, 2006, 20 checks; January 5, 2006, 10 checks; January 8, 2006, 1 check; and January 9,

2006, 9 checks.

36.     On January 12, 2006, Fresno JTTF coordinated a consensually monitored meeting

between Muthana, the Cooperating Witness and the Undercover Agent to recover the balance of

the check transaction.  This was the second and final meeting between Muthana and the

Undercover Agent regarding the EDD undercover operation.  During the meeting, Muthana

provided the Undercover Agent with $44,296.00 in cash and kept $4,440.00 as his fee for

cashing the checks.

37.     Muthana negotiated all of the 324 EDD checks for a total amount of $209,130.00

through his Ranchito Market business account, between September 29, 2005, and January 9,

2006.

2.     Contraband Cigarettes:

38.     On July 1, 1959, the State of California enacted an excise tax of three (3) cents on

each pack of cigarettes sold within the state.  Since the tax was established, California has raised

this excise tax three times to its current 87 cents per pack.  The amount of tax required to be

collected by the State of California on each pack of cigarettes sold within the state makes illegal

distribution of untaxed cigarettes a lucrative endeavor for criminal racketeers.

39.     Every state imposes some tax on the sale of cigarettes.  The liability for these

taxes generally arises once the cigarettes enter the jurisdiction of the state. The vast majority of

states requires a "tax stamp or imprint" to be placed on packages of cigarettes to demonstrate that

14

the state tax has been paid.  Wholesale distributors in the various states, to include the State of

California, are generally responsible for the payment of the state tax and for affixing the tax

stamp or imprint.

40.     The illegal trade in cigarettes and tax stamps deprives governments of lawful tax

revenue and harms legitimate trade channels.

41.     During the January 12, 2006, meeting, the Undercover Agent briefly discussed

with Muthana the possibility of Muthana purchasing contraband Marlboro cigarettes.

42.     On July 13, 2006, during a consensually recorded conversation between the

Cooperating Witness and Muthana, the Cooperating Witness advised Muthana that he (CW) had

spoken to his friend (JTTF Agent) and that his friend's uncle (UCA) wanted to meet with

Muthana on July 18, 2006.  The Cooperating Witness stated that the Undercover Agent would be

bringing the cigarettes he (UCA) had for sale to the meeting.  The Cooperating Witness advised

that the cigarettes were stolen out of state and the tax stamps were from California.  Muthana

asked the Cooperating Witness if the stamps were stolen as well and the Cooperating Witness

told Muthana that they were.  The Cooperating Witness advised Muthana that the tax stamps

would pass all the tests that the police use.  Muthana asked the Cooperating Witness how much

the cigarettes would cost and the Cooperating Witness advised he would get an exact price from

his friend.

43.     The Cooperating Witness explained to Muthana that his friend (JTTF Agent) also

advised that they (Muthana and the CW) would need to place the tax stamps on the packs of

cigarettes as soon as they received them.  Muthana agreed and stated, "Yeah we have to, when

we get them we'll do it right away, we don't want any trouble."  Muthana advised the Cooperating

15

Witness to get an exact price for the cigarettes and stated that they would buy whatever amount the Undercover Agent could provide.

44.     Agents from the Bureau of Alcohol, Tobacco and Firearms (ATF) supplied four cases of Marlboro cigarettes (48,000 cigarettes) and two rolls of specially marked California cigarette tax stamps to be used for the controlled buy operation.

45.     On July 18, 2006, ATF agents with the assistance of Fresno JTTF agents conducted a controlled sale of four cases of reportedly stolen Marlboro cigarettes and two rolls of counterfeit State of California cigarette tax stamps to Muthana in the parking lot of the Save Mart store, located at 3318 Whitson Avenue, Selma, California.

46.     During the consensually monitored meeting between Muthana, the Cooperating Witness and the Undercover Agent in the Save Mart parking lot, Muthana agreed to and purchased four cases of reportedly stolen Marlboro cigarettes and two rolls of counterfeit California tax stamps. Muthana paid the Undercover Agent $4,800.00 in United States currency for the items. The contraband cigarettes and tax stamps were placed into Muthana's red Chevrolet Avalanche truck (new, no licence plates) and Muthana and the Cooperating Witness left the location.

47.     The Undercover Agent met agents at a predetermined location after the buy operation and ATF agent Helen Dunkel retrieved and took custody of the $4,800.00 and the recording device used during the buy operation.

3.      Material Support to a Terrorist Organization and Illegal Money Transmitting Business:

1.      Background:

16

a.     Terrorist Organization:

48.     Under Title 18, United States Code, Section 2339B it is unlawful to provide "material support or resources" to an organization the Secretary of State has designated as a "Foreign Terrorist Organization." The Secretary of State designates Foreign Terrorist Organizations (FTO's), in consultation with the Attorney General and the Secretary of the Treasury. These designations are undertaken pursuant to the Immigration and Nationality Act (INA), as amended by the Antiterrorism and Effective Death Penalty Act of 1996.

49.     On October 8, 1997, Department of State designated Hizballah as a foreign terrorist organization, pursuant to Section 219 of the Immigration and Nationality Act, as added by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 302, 110 Stat. 1214, 1248 (1996), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996). 62 Fed. Reg. 52,650 (1997). Hizballah has been continuously designated since that date.

53.     In September 2006, FBI Buffalo JTTF advised members of the Fresno JTTF that during an ongoing Buffalo investigation that involving money laundering and unlicenced money transmitting, one of the Buffalo subjects stated an individual in California could move $100,000.00 overseas without problems. Buffalo agents with the assistance of the Fresno JTTF identified the California individual as Muthana and an Immigration and Customs Enforcement Confidential Witness (ICE CW) was introduced telephonically to Muthana by a Buffalo subject. Several consensually monitored phone calls were made between the Immigration and Customs Enforcement Cooperating Witness and Muthana discussing the movement of money overseas. The Immigration and Customs Enforcement Cooperating Witness arranged to meet with

Muthana in Fresno, California, on November 11, 2006, in order to personally make arrangements for the movement of $60,000.00 overseas and to establish a possible future ongoing business relationship.

54.     On November 11, 2006, a joint undercover money laundering sting operation took place at the Piccadilly Inn, Room 137, located at 5115 East McKinley Avenue, Fresno, California. The consensually monitored meeting (audio and video) involved Muthana, an Immigration and Customs Enforcement Undercover Agent, an Immigration and Customs Enforcement Cooperating Witness and a FBI Cooperating Witness.

55.     During the meeting, the Immigration and Customs Enforcement Undercover Agent and Immigration and Customs Enforcement Cooperating Witness informed Muthana that they are involved in various illegal activities to include counterfeit cigarettes, the sale of counterfeit goods, and the sale of stolen property. The Immigration and Customs Enforcement Undercover Agent informed Muthana on approximately 2 occasions, that their (ICE UCA and ICE CW) main client is Hizballah, and they (ICE UCA and ICE CW) need to get the money ($60,000.00) overseas to Hizballah to help rebuild Hizballah schools and bases.

56.     The Immigration and Customs Enforcement Undercover Agent explained to Muthana that Hizballah operatives in the United States provide them (ICE UCA and ICE CW) with the stolen merchandise. The Immigration and Customs Enforcement Undercover Agent and Immigration and Customs Enforcement Cooperating Witness then sell the merchandise at a considerable profit and after taking their cut, send the remaining amount back to Hizballah in Lebanon.

18

57.     Muthana was told by the Immigration Customs Enforcement Undercover Agent

that if the guys of Hizballah in Beirut were happy, Muthana would get a bonus and the

Immigration and Customs Enforcement Cooperating Witness told Muthana there would be more

business on a monthly basis, not just a one time thing.  The Immigration and Customs

Enforcement Cooperating Witness stated that he would meet Muthana every month for 5-10

minutes and hand Muthana the money and leave.  Muthana stated he could move $20,000.00 per

week.

58.     At this meeting, Muthana took possession of the $60,000.00 and agreed to transfer

the money for a 6% fee.  The Immigration and Customs Enforcement Cooperating Witness and

Immigration and Customs Enforcement Undercover Agent offered Muthana a bonus if he

transferred the money directly to their bank in Bahrain, rather than going through Muthana's

contact in Yemen and then to Bahrain.  Muthana indicated he would consider this request.  The

Immigration and Customs Enforcement Cooperating Witness provided Muthana the bank name,

account number and swift code for the UC account in Bahrain.  Muthana provided his fax

number to the Immigration and Customs Enforcement Cooperating Witness (559) 992-3861,

which is the business telephone number for the Ranchito Market.  The meeting concluded and

Muthana took the $60,000.00 that had been placed in a "GAP" bag and left the hotel.  A

surveillance team then followed Muthana back to his business/residence, located at 2749 Whitley

Avenue, Corcoran, California.

59.     On November 13, 2006, the Immigration and Customs Enforcement Cooperating

Witness receives a phone call from Muthana in California.  The call was consensually monitored

and recorded and Muthana informed the Immigration and Customs Enforcement Cooperating

Witness that he (Muthana) would send the money directly to the bank in Bahrain, but wanted to be paid 10% of the amount being sent.  The Immigration and Customs Enforcement Cooperating Witness informed Muthana he would check with his partner (ICE UCA) and get back to him.

60.     On or about November 15, 2006, the Immigration and Customs Enforcement Cooperating Witness placed a consensually monitored phone call to Muthana and informed Muthana that he had spoken with his partner (ICE UCA) and they were willing to pay him a 10% fee to send the money directly to Bahrain.  Muthana informed the Cooperating Witness he intended to send approximately $25,000.00 in the next day or so to Bahrain.

61.     On or about November 22, 2006, a deposit was received in the Immigration and Customs Enforcement undercover bank account in Bahrain from an individual/business named "Abdulla Q. Ahmed" in the amount of $24,988.00.  No bank account was located on the transaction.

62.     On or about November 28, 2006, a deposit was received from bank account number 706-022456 into the Immigration and Customs Enforcement undercover bank account in Bahrain from an individual/business named "Abdulla Q. Ahmed, dba, Abdulla Inter." in the amount of $29,990.00.  Muthana has a Bank of the West business account under the name of Abdulla's International Transfer, account #706-022456.

63.     As of November 28, 2006, the Immigration and Customs Enforcement undercover bank account in Bahrain had received a total of $54,978.00 from the original $60,000.00 given to Muthana to transfer overseas for Hizballah.  Muthana retained $5,022.00 for his transaction fee.

64.     On January 27, 2007, the Cooperating Witness spoke with Muthana at the

Ranchito Market, and Muthana informed the Cooperating Witness that he (Muthana) had just received a telephone call from "the Lebanese guys" (ICE CW) and discussed a money transaction that they (ICE UCA and ICE CW) wanted to initiate. Muthana advised that they (ICE UCA and ICE CW) wanted to send between $175,000.00 and $200,000.00 in the coming weeks. Muthana was very excited about the transaction and informed the Cooperating Witness that he would make approximately $15,000.00 from the deal. Muthana further stated to the Cooperating Witness, "I hope I don't have any problems, because he said the money was going to Hizballah." Muthana stated that he planned to send the money in increments of $25,000.00 to $30,000.00 per week until the final amount was reached.

65.    On February 18, 2007, a second joint undercover operation targeting Muthana took place in Room 123 of the Piccadilly Inn, located at 5115 East McKinley Avenue, Fresno, California. The consensually monitored meeting (audio and video) involved Muthana, an Immigration and Customs Enforcement Undercover Agent, an Immigration and Customs Enforcement Cooperating Witness and a FBI Cooperating Witness.

66.    During the meeting, the Immigration and Customs Enforcement Undercover Agent and Immigration and Customs Enforcement Cooperating Witness again informed Muthana that they are involved in various illegal activities. The Immigration and Customs Enforcement Undercover Agent and Immigration and Customs Enforcement Cooperating Witness again represented they had ties to Hizballah and requested Muthana help facilitate the movement of $80,000.00 in United States currency overseas to assist Hizballah with purchasing weapons and uniforms. Muthana agreed to assist them and wire transfer the money to the same Immigration and Customs Enforcement undercover bank account in Bahrain for an enhanced fee of 12%. The

21

meeting concluded and Muthana took the $80,000.00 that had been placed in a brown paper grocery bag with paper handles and left the hotel. A surveillance team then followed Muthana back to his business/residence, located at 2749 Whitley Avenue, Corcoran, California.

67.     The Immigration and Customs Enforcement Undercover Agent told Muthana that people in Beirut, Lebanon, were very happy and impressed with his attitude (Muthana). The Immigration and Customs Enforcement Undercover Agent said his guy Samir in Lebanon had said that they needed a lot of money moved over to Lebanon to buy weapons and uniforms and he (Samir) promised to give a bonus if he (Muthana) could increase the flow of money. Muthana said he preferred to transfer money through Bahrain and he (Muthana) could not move more than $25,000.00 dollars a week. The Immigration and Customs Enforcement Undercover Agent told Muthana that Samir, the Hizballah guy, in Beirut trusted Muthana and that he (Samir) was happy the money was from Muthana. The money was needed in Lebanon quickly and Samir had agreed to increase Muthana's commission to 12%.

b.     Money Remitting Business:

68.     The Financial Crimes Enforcement Network (FinCen) within the United States Department of the Treasury is charged with administering the Bank Secrecy Act, to include Money Services Business (MSB), supporting law enforcement, intelligence, and regulatory agencies through sharing and analysis of financial intelligence. The mission of FinCen is to safeguard the financial system from the abuses of financial crimes, including terrorist financing, money laundering, and other illicit activity.

69.     Muthana is currently registered with the FinCen as a MSB under the name

22

Abdulla Q. Ahmed, dba Ranchito Market.  The Ranchito Market is registered with FinCen to cash checks and transmit money.  Muthana and the Ranchito Market are licensed as an agent of Continental Exchange Solutions Inc. with the State of California, as required by law, but are not licensed independently with the State of California to send money abroad as a money transmittal company .

70.   Continental Exchange Solutions Inc. Compliance Officer Karen Barnes stated that an agent of their company could only use  computer equipment and software supplied by the company to legally transmit money through their system.  Any company agent not going through their system was out of compliance and could not transmit money under their company umbrella. Regarding the November 11, 2006 meeting, Muthana did not use Continental Exchange Solutions Inc. to transmit the money to the Immigration and Customs Enforcement undercover bank account in Bahrain.

71.   Despite this requirement, Muthana did not use the Continental Exchange Solutions Inc. transmittal system to transfer $54,978 in United States currency, in the two separate transactions describe above, from the United States to the undercover bank account in Bahrain.  Additionally, the money did not appear to be run through any other approved MSB.

## CONCLUSIONS REGARDING SEIZURE

72.   To date, the FBI investigation has determined Muthana has laundered approximately $269,130.00 and purchased 4 cases of reportedly stolen Marlboro cigarettes and two rolls of counterfeit California tax stamps for $4,800.00.  Some of the funds from his illegal activities are believed to be deposited in at least six bank accounts of which Muthana has

23

dominion and control. Also information provided by a FBI CW during the investigation indicates Muthana keeps business records and U.S. currency at both the Ranchito Market, Ranchito Market #2, and his residence.

a.      Bank of West Account Number 706-025970 held in the name of Abdulla Q. Ahmed, dba, Ranchito Market, 2749 Whitley Avenue, Corcoran, California, Social Security Number 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. This account is the Ranchito Market business account.

b.      Bank of West Account Number 706-023710 held in the name of Abdulla Q. Ahmed, dba, Ranchito Market Lottery Account, 2749 Whitley Avenue, Corcoran, California, Social Security Number 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. This account is the Ranchito Market lottery account.

c.      Bank of West Account Number 706-001633 held in the name of Abdulla Q. Ahmed, dba, Abdulla's Ranchito Market #2, 2749 Whitley Avenue, Corcoran, California, Social Security Number 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. This account is the Ranchito Market #2 business account.

d.      Bank of West Account Number 706-022456 held in the name of Abdulla Q. Ahmed, dba, Abdulla's International Transfer, 2749 Whitley Avenue, Corcoran, California, Social Security Number 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. This account is a use to move money overseas.

e.      Bank of West Account Number 706-257524 held in the name of Abdulla O. Ahmed, 2749 Whitley Avenue, Corcoran, California, Social Security Number 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. This account is a savings account.

f.      Bank of West Account Number 706-022456 held in the name of Abdulla Q. Ahmed, dba, Ranchito MKT, 2749 Whitley Avenue, Corcoran, California, Social Security Number 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. This account is a certificate of deposit.

g.   All money, negotiable instruments, securities, or other things of value traceable to the subject's violations found in his residence located at 2749 Whitley Avenue, Corcoran, California 93212.

h.   All money, negotiable instruments, securities, or other things of value traceable to the subject's violations found in the Ranchito Market located at 2749 Whitley Avenue, Corcoran, California 93212.

i.   All money, negotiable instruments, securities, or other things of value traceable to the subject's violations found in the Ranchito Market #2 located at 2838 Waukena Drive, Tulare, California 93274.

j.   All funds held in any Bank of the West Account in the name of Abdulla Qassem Ahmed Muthana, a.k.a. Abdulla Q. Ahmed, Abdulla Qassem Ahmed, Abdulla Kasem Ahmed Muthana or Abdulla Kesem Ahmed.

73.   Based on the aforementioned evidence outlined in this affidavit and on my training and experience, I have probable cause to believe that Abdulla Qassem Ahmed Muthana violated Title 18 U.S.C. § 1956(a)(3)(money laundering), U.S.C. §2342(a)(Purchase Contraband Cigarettes), and U.S.C. § 1960(a)(1)(c)(Unlicensed Money Transmitting). Moreover, I have probable cause to believe that said proceeds from these unlawful activities were deposited into the aforementioned financial accounts, and/or hidden at the Ranchito Market, Ranchito Market #2 or Muthana's residence. The evidence also provides sufficient probable cause to establish that Abdulla Qassem Ahmed Muthana commingles legitimate funds from his businesses with the proceeds from the reported fraudulent EDD check cashing scheme and money represented to be

25

unlawful proceeds from a variety illegal activities to assist Hizballah, Title 18 U.S.C. § 1956(a)(3)(money laundering). These combined funds are deposited into Muthana's financial accounts in order to conceal or disguise the nature, location, source, ownership, or control of the specified unlawful activity proceeds.

74.    Based upon the facts set forth herein, I believe that all the property listed in paragraph number 2 above is subject to forfeiture.

a.    To the extent the property is derived from proceeds traceable to a specified unlawful activity, specifically the money move through Muthana's bank accounts is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

b.    All other property is subject to forfeiture as any property involved in a transaction or attempted transaction set forth in Title 18 U.S.C. § 1956(a)(3); thus, it is all subject to seizure and forfeiture pursuant to Title 18 U.S.C. § 981(a)(1)(A).

75.    In addition to being forfeitable as commingled funds, any allegedly "legitimate" funds in the account are also subject to forfeiture as fungible assets pursuant to section 984 as proceeds of specified unlawful activities. Section 984 provides that "in any forfeiture action in rem in which the subject is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals - (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and (B) it shall not be a defense that the property involved in such offense has been removed and replaced by such property. Except as provided in subsection (b), any identical property found in the same place or account as the property involved

26

in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section."

Subsection (b) specified that no action to forfeit property directly traceable to the offense under

this section may commence more than one year from the date of the offense.  Accordingly, for all

proceeds of specified unlawful activities occurring in the  past 12 months the Government need

not directly identify the property and can instead seek forfeiture of the bank accounts as fungible

assets.

76.     Therefore, seizure warrants are authorized pursuant to Title 18 U.S.C. §

981(a)(1)(A).

## SEALING REQUEST

77.     This affidavit is made in support of an application for civil seizure warrants, and

arises out of the same facts and transaction as a criminal investigation regarding Muthana and

others.  That criminal investigation is continuing.  Disclosure of the contents of this affidavit at

this time would seriously impede the continuing investigation and prosecution by disclosing

details of the Government's investigation, which could potentially cause target(s)/subject(s) of

the investigation to flee, destroy evidence, or intimidate and attempt to influence potential

witnesses in this case.  Accordingly, the Court is respectfully requested to issue and order sealing

this affidavit until further order of the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this

24th day ___FEB___, 2007.


Brad L. Lehr
Task Force Officer
Joint Terrorism Task Force
Federal Bureau of Investigation

# United States District Court

| EASTERN | DISTRICT OF | CALIFORNIA |
|---|---|---|

In the Matter of the Seizure of

(Name, address or brief description of person or property to be search)

**All funds in Bank of the West Account Number 706-022456 held in the name of Abdulla Q. Ahmed, DBA Abdulla'S International Transfer, 2749 Whitley Avenue, Corcoran, California 93212.**

## SEIZURE WARRANT

CASE NUMBER:

**1: 07 SW 00 3 4    LJO**

TO:   Brad L. Lehr, Task Force Officer, FBI                    and any Authorized Officer of the United States

Affidavit(s) having been made before me by _____   Brad L. Lehr, Task Force Officer, FBI _____   who has reason to

Affiant

believe that in the   **Eastern**   District of   **California**   there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized):

**All funds in Bank of the West Account Number 706-022456 held in the name of Abdulla Q. Ahmed, DBA Abdulla's International Transfer, 2749 Whitley Avenue, Corcoran, California 93212.**

**Which is subject to forfeiture pursuant to 18 U.S.C. §§ 981(a) and 984 and subject to seizure pursuant to 18 U.S.C. § 981(b).**

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

YOU ARE HEREBY COMMANDED to seize within 10 days the property specified, serving this warrant and making the seizure in the daytime, 6:00 A.M. to 10:00 P.M., leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant to Sandra M. Snyder or any

U.S. Judge or Magistrate

Feb 24, 2007   12:35 pm   at   Fresno, California

Date and Time Issued                          City and State

Lawrence J. O'Neill, U.S. District Court Judge

Name and Title of Judicial Officer                   Signature of Judicial Officer

**RETURN**

| Date Warrant Received | Date and Time Warrant Executed | Copy of Warrant and Receipt For Items Left With |
|---|---|---|
|  |  |  |

Inventory Made in the Presence of

Inventory of Person or Property Taken Pursuant to the Warrant

**CERTIFICATION**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____        _____
          U.S. Judge or Magistrate                              Date