UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. OLIVER W. WANGER, JUDGE

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,             )   No. O6-CR-321-OWW
                               )
vs.                            )   SENTENCING
                               )
ABDULLA KASEM AHMED MUTHANA,   )
                               )
        Defendant.             )
_____)

Fresno, California                  Monday, June 2, 2008


REPORTER'S TRANSCRIPT OF PROCEEDINGS


KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:       United States Attorney's Office
                         BY: **STANLEY BOONE**
                         2500 Tulare Street
                         Suite 4401
                         Fresno, California 93721


For the Defendant:       **J.M. IRIGOYEN**
                         Attorney at Law
                         2131 Amador Street
                         Fresno, CA   93721

3

1    Monday, June 2, 2008                    Fresno, California

2    1:29 p.m.

3            THE CLERK:  The Court calls item number two.  Case

4    number -- I'm sorry.  Item number 19.  Case number 06-CR-321.

5    United States versus Abdulla Kasem Ahmed Muthana.  Sentencing.

6            MR. BOONE:  Good afternoon, Your Honor, Stan Boone on

7    behalf of the United States.

8            MR. IRIGOYEN:  J.M. Irigoyen with the defendant, who

9    is present in court being assisted by the interpreter in the

10   Arabic language.

11           THE COURT:  Thank you.  This is the time set for

12   sentencing.  Are the parties ready to proceed?

13           MR. IRIGOYEN:  Yes, Your Honor.

14           MR. BOONE:  Yes, Your Honor.

15           THE COURT:  Mr. Muthana, has the advisory guideline

16   presentence investigation report been translated from English

17   to AR back so you could understand it?

18           THE DEFENDANT:  Yes.

19           THE COURT:  Have you had a chance to discuss the

20   recommendation for your sentence with your attorney, Mr.

21   Irigoyen?

22           THE DEFENDANT:  Would you repeat it, Your Honor?

23           THE COURT:  Yes.  Have you had a chance to discuss

24   the recommended sentence, that's by the probation officer who

25   recommends the sentence, with your attorney, Mr. Irigoyen?

4

1              THE DEFENDANT:  Yes.

2              THE COURT:  Do you understand the recommendation

3    being made for your sentence?

4              THE DEFENDANT:  Yes.

5              THE COURT:  I will note that I have received and read

6    carefully the letter that you have submitted.  Additionally,

7    your attorney has filed a motion for downward departure or

8    variance and the government has filed an opposition to that.

9    All of which I have read and fully considered.

10             The process we are going to follow in sentencing is,

11   first, I L listen --

12             MR. IRIGOYEN:  Your Honor, may we have a moment?

13             MR. BOONE:  What's the letter that you have, Your

14   Honor, that was written by the defendant.  Was it a separate

15   letter?

16             THE COURT:  It was written in Arabic.

17             MR. BOONE:  Okay.

18             THE COURT:  It is dated -- bear with me while I find

19   the date.

20             MR. BOONE:  If you're just referring to the one

21   attached to the PSR, then I have that.  I thought there might

22   be a separate letter by the way you're describing it.

23             THE COURT:  It is attached.

24             MR. BOONE:  Yeah.  I have that one.

25             THE COURT:  December 5th of 2007.

1          MR. BOONE:  I have that one.

2          THE COURT:  The procedure we're going to follow is

3     first I will listen to your attorney, Mr. Irigoyen.  And he'll

4     state what he believes the right sentence would be in this

5     case.  Then Mr. Boone will give us the government's position.

6     If you wish to say anything, I will listen to whatever you

7     have to say.

8          Do you understand how we're going to proceed?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Mr. Irigoyen.

11          MR. IRIGOYEN:  Has the Court received my reply to

12     motion for downward departure?

13          THE COURT:  Your reply?  When was it filed?

14          MR. IRIGOYEN:  Last week.

15          THE CLERK:  I believe it was document 51.  I'll

16     reprint it.

17          MR. BOONE:  Your Honor, do you need it?

18          THE COURT:  I think the courtroom deputy is printing

19     it right now.

20          MR. BOONE:  You can take a look at mine and then she

21     can give me your copy.

22          THE COURT:  All right.  Thank you.

23          MR. IRIGOYEN:  Your Honor, I'd like to start my

24     argument with the reply to the government's opposition.  And

25     the reason is that the government goes to great length in

1   presenting to the Court all the things that it believes my

2   client had been doing in the past, which is prior bad acts and

3   misconduct, to show that he had a predisposition or he is not

4   entitled to a downward departure.

5          And I have set forth in my reply that pursuant to *US*

6   *versus Elfgeeh*, *US versus Rosner*, *US versus Petty* and *McMillan*

7   *versus Pennsylvania*, that whenever the government seeks to

8   introduce prior uncharged bad act evidence without a full

9   evidentiary hearing and a showing beyond a reasonable doubt,

10  not just a preponderance, that this evidence should be

11  excluded.

12         And so I would ask the Court to exclude on this basis

13  the government's argument contained in pages five, six, seven

14  and eight dealing with the hawala activity that the government

15  claims the defendant did, which is illegal.

16         And to begin, we have filed a motion for downward

17  departure based on several items.  I want to clarify to the

18  Court that the $120,000 that the defendant gave up was his

19  money, he was not entitled to a plea agreement unless he gave

20  up this money.  We went back and forth several times trying to

21  figure out how the defendant could enter a plea without having

22  to give up every penny the government seized from every bank

23  account, every dollar, every check.  They even took the

24  pennies out of his cash register.  They cleaned him out.

25         And I put in my motion for downward departure exactly

1    what the moneys were and how much he claimed was taken from

2    him.  That's a lot of money.  And that definitely has impaired

3    his ability to defend himself and take this to trial.

4           As for the entrapment defense and what would be, in

5    this Court referred to either sentencing entrapment or

6    imperfect entrapment.  The facts of this case are that

7    government agents, with an informant, came to my client

8    themselves with fake EDD checks.  He did not seek them out.

9    They sought him out.  They returned on three further

10   occasions.

11          They could have arrested him after the first batch of

12   58 checks for $36,000.  They didn't.  They came back over and

13   over and over.  The second time with 108 manufactured fake

14   checks for a total of 69,000.  The third time with 84 checks

15   with a total of 53,000.  74 checks with a total of $48,000.

16   All these are government manufactured checks.

17          It didn't end there.  They came back two other times

18   with $60,000 cash of their own with a new scheme that they put

19   together, asking him to make money by wiring this money to

20   Bahrain.

21          And that wasn't enough.  They came back again with

22   another 80,000 and this time the defendant got very, very

23   scared because they made it very clear that the money was

24   going to Hizballah.  So he didn't transfer this money because

25   he doesn't want to have anything to do with the

1    terrorists -- and this is contained in the letter the Court

2    read and other information in the PSI.

3         To his good luck, since he didn't transfer this

4    money, a raid was conducted to recover the 80,000.  And so it

5    stopped there.  Who knows how much further the government's

6    sentencing entrapment would have continued to raise the

7    offense level.  Started out at 36,000 and it ends up now at

8    almost 400,000.

9         It is our position that at some point the Court needs

10   to take into consideration the fact that this is a scheme that

11   the government itself cooked up, two separate schemes.  And

12   they were there merely to appeal to his greed, to make money.

13   That's it.

14        And so this is being presented as a downward

15   departure sentencing entrapment.  And we would ask the Court

16   for a downward departure for that.  The taking of $120,000 in

17   legitimate funds also is being characterized as an

18   extraordinary acceptance of responsibility.  Something the

19   defendant did not have a choice in.  But should be taken into

20   consideration by the sentencing court.

21        If the defendant had any prior history, had been in

22   trouble with the law previously for any kind of white collar

23   crime, these defenses would fall on moot ears.  What we have

24   today is an individual who was enticed by the government to

25   make money over and over and over to the government's benefit,

1    giving him a higher offense level for sentencing purposes.

2            There are other grounds also listed in the motion for

3    downward departure that don't merit repeating.  They are loss

4    of naturalization rights.  And what I call sentencing

5    manipulation.

6            I'm asking the Court to downward depart at least two

7    and up to six levels.  And I don't know what point the Court

8    wants the defendant to make his statement.

9            THE COURT:  After we hear from the government.

10           MR. IRIGOYEN:  Okay.

11           THE COURT:  Thank you very much, Mr. Irigoyen.

12           Mr. Boone.

13           MR. BOONE:  Yes, Your Honor.  Thank you.

14           Your Honor, eloquent speech for sentencing, but not

15   consistent with the law or facts of this case.  First, with

16   regard to the law.  As the Court is aware, that the Court

17   applies the sentencing guidelines.  They are not mandatory.

18   It's something that the Court take into consideration in

19   assessing the appropriate reasonable sentence for the

20   defendant to be given in this case.

21           The second factor the Court looks to are the 3553

22   factors, which the Court then takes a look at a variety of

23   factors in assessing, again, the reasonableness of a

24   defendant's sentence.

25           In this case, the defense filed a motion for downward

1    departure based upon a variety of issues set forth, most of

2    which were lacking in authority by which the Court could

3    consider those consistent with the guidelines.

4           However, that being said, the Court can clearly

5    consider 3553 factors.  And the government is not suggesting

6    that the Court cannot consider these facts in assessing and in

7    making an appropriate and a reasonable sentence in this case.

8           The government's response to this, for which the

9    defense now graciously wishes the Court to strike, is in

10   response to the defendant's argument that somehow the

11   government should be charged here with a conduct related to

12   this defendant.  That this defendant is innocent of the

13   charges to which he pled guilty.  That he committed nothing

14   other than he was forced because we took his precious money

15   and therefore could not have made an adequate defense on the

16   case.

17          I think that insults what many individuals do here

18   without the use of money, individuals that are appointed by

19   the Court that have appropriate legal representation.  I think

20   Mr. Irigoyen is, again, appropriate in his fiduciary duty in

21   his legal representation of this defendant.  But to suggest

22   somehow because the government took away his legitimate money,

23   which I'll speak to in a moment, that this defendant was

24   somehow denied some sort of due process right.  I think that

25   is an absurd result and an absurd argument with regard to this

1    particular defendant.

2           As to the legitimacy of this funds, the government

3    pointed out in its response to these funds were not related to

4    the defendant.  These were -- even if you take the defendant's

5    position that these were legitimate funds that he had as part

6    of his business, they were not his funds to use.  They were

7    held in trust as a fiduciary relationship.  This was not his

8    net profit.  Nothing suggested that this defendant had this

9    kind of net profit during the course of operating these two

10   stores, one of which was in Corcoran, California.  So this was

11   not his money to play with.

12          The government contends that this money was illegal

13   hawala money, to which the defendant transferred money

14   overseas or maintained a book.  That's where we supplied the

15   book in this case with regard to this defendant's legal

16   proceeds.

17          The defense, in its reply to our opposition, points

18   out that the defendant had a money service, money

19   transmitting, something like a Western Union.  He did, in

20   fact, have that.  But he didn't use that for purposes of

21   transferring these types of funds.  He used it mainly for

22   transferring funds to Mexico.  And, in fact, the sting money

23   that was used in this case was not transferred through his

24   money remitting -- legitimate money remitting part of the

25   business.

1          With regard to the sentencing entrapment, I can tell

2     you that while I did not handle the investigation of this

3     case, another assistant prior to my time, these agents don't

4     know what the loss amount for purposes of guideline

5     calculation are.

6          There are instances in which the government needs to

7     make more than one transaction, a number of transactions in

8     order to appropriately make an appropriate case against an

9     individual.  I think this Court is aware, from at least on one

10    occasion that this Court has had, that I have prosecuted

11    market owners for illegally remitting funds.  This was not a

12    case where we decided to pick up a market owner in the middle

13    of the state and so-call entrap them.  We had received

14    information that this defendant had been illegally cashing

15    illegal or fraudulently acquired EDD checks.  And that was the

16    basis for this.  So --

17         MR. IRIGOYEN:  I would object to that, Your Honor.

18    That's a prior bad act that's not appropriate in this

19    sentencing.

20         MR. BOONE:  Now, I'd like to speak to the prior bad

21    acts to which the defendants --

22         THE COURT:  I'll reserve my ruling on the objection

23    until I hear the government's response.

24         MR. BOONE:  With regard to the prior bad acts to

25    which the defendant -- that's absolutely an incorrect

1    statement of the law with regard to couching something under

2    404(b).  This is not a 404(b) in context of other character

3    evidence of the defendant.  These are factors that this court

4    can consider under 3553 in assessing the appropriate sentence.

5            Second, and more importantly, this is in response to

6    the defendant's argument that he was sentencing entrapped or

7    the government committed some sort of outrageous government

8    conduct.

9            The government is perfectly appropriate in responding

10   to those allegations.  This was not something the government

11   put before the Court in fashioning a sentencing memorandum for

12   this defendant.  It was in response to their comments and to

13   their argument of some sort of outrageous government conduct.

14           So again, it is an appropriate standard by which

15   these other facts under 404(b).  It's not beyond a reasonable

16   doubt, it's preponderance of the evidence to which the Court

17   can consider in this case.

18           The defense initial motion for downward departure is

19   basically a scam.  In terms of its analysis and in terms of

20   its factual basis.  The government offered its information in

21   addition to, as to why this court can consider that, but

22   reject that.  So if we're looking at a lack of factual

23   underpinnings, frankly, the defendant who bears the burden is

24   lacking in that department.

25           So we would object to the motion for downward

1    departure being considered if the Court is considering

2    striking the part of the reply to which the defense has

3    articulated.

4           With regard to the transaction, the 60 and 80,000

5    transaction that occurred in November of 2006 and the

6    subsequent February of 2007 transaction, that information is

7    regarding information that came as a result of an information

8    out of the Western District of New York with regard to other

9    activities that were occurring out of that district that then

10   came to this district.

11          This defendant was told in November that these moneys

12   were going to be used for Hizballah.  He knew back in

13   November.  He didn't need to know that -- he didn't first find

14   out about the Hizballah in February of 2007, he knew about it

15   in November of 2006.  And therefore transferred the money as a

16   result of that.  He wanted to make money.  It's not something

17   that the government did to entrap this defendant in this case.

18   Those later counts, counts five and six, were a result of an

19   agreement with the Western District of New York and the

20   Eastern District of California to plead all these cases out in

21   this district.

22          So it is clear that the defendant knew where the

23   moneys were going, he knew in November that it was going to

24   Hizballah.  He knew again in February of 2007.  The reason

25   that he -- the reason the government believes that he didn't

1   transfer those moneys is because his associates in the Western

2   District of New York were arrested on the weekend.

3          At all points in time the defendant said that he was

4   going to be transferring those moneys.  He didn't because his

5   associates, we believe, were arrested in New York and he knew

6   about their arrest.  Mr. Irigoyen knows that from the

7   intercepts in the case.

8          So we believe that based upon all of that, balancing

9   out the factors set forth in 3553, the government is

10  recommending that we ask for no more than the mid range of the

11  applicable guideline range.

12         But we are agreeing to -- it's -- the range is

13  between 30 and 37 months, but we are recommending that the

14  defendant be sentenced to 33 months in prison.  I think that's

15  a fair and reasonable sentence in light of what this defendant

16  did.

17         I would also ask the Court to adopt the preliminary

18  order of forfeiture in this case and incorporate it by

19  reference in the final judgment.  Thank you.

20         THE COURT:  Thank you, Mr. Boone.

21         MR. IRIGOYEN:  May I respond briefly?

22         THE COURT:  Yes, you may.

23         MR. IRIGOYEN:  I had my investigator -- I'm sorry, my

24  interpreter listen to the recorded conversations between the

25  informant and my client in November and February.  In the

1    November tape, he only found a vague reference to Hizballah.

2    But in the February tape, he found numerous references.  And

3    so I don't agree with the government that the

4    February -- excuse me, that November, 2006 contact with law

5    enforcement and the informant made it clear that these moneys

6    were being transferred for Hizballah.

7         But be that as it may, I just want to point out a few

8    things to the Court.  As far as the sentencing entrapment is

9    concerned, if the Court were to add up the four batches of

10   checks that were brought to the defendant to be cashed, these

11   are the government manufactured checks, when the fourth batch

12   of checks come, it barely passes the 200,000 threshold.

13        Be that as it may, the government says they have no

14   desire to have anything to do with raising his offense level.

15   If the Court just adds it up, they will see that when the last

16   $48,000 worth of checks is brought over to the defendant, that

17   is what just barely brings them over the 200,000 threshold

18   point, which results in a two level higher offense level.

19        The second thing is that while there's a lot of

20   speculation about whose money was what in the defendant's

21   possession, the truth of the matter is that the government

22   does not refute the fact that the $120,000 it took from the

23   defendant did not belong to the government.  This is the

24   defendant's operating expense.  Irrespective of the debts that

25   he had, I have, who knows how many hundreds of thousands of

1   dollars of debt, that doesn't mean that every dollar I make

2   belongs to someone else.

3          Therefore, I would argue that as far as the hawala

4   evidence is concerned, it is not relevant that this is money

5   that belonged to others and not his operating expense.  I

6   think we've made it clear here our position that the

7   government did have something to do with raising his offense

8   level and he should be allowed a downward departure for his

9   part.  Thank you.

10          THE COURT:  Thank you very much, Mr. Irigoyen.

11          MR. BOONE:  Your Honor, my only response is if you

12   look at the hawala book that we allege, there are even

13   amounts.  100, 200,000, etc.  That's it.  Thank you.

14          THE COURT:  Thank you.

15          Mr. Muthana, do you wish to say anything?

16          THE DEFENDANT:  I have --

17          THE INTERPRETER:  He didn't understand you.

18          MR. IRIGOYEN:  Thank you, Your Honor.

19          THE DEFENDANT:  Can I read my letter to you?

20          THE COURT:  Yes.  If you wish.  I have read it very

21   carefully, but if you want to read it to me, you may.

22          THE DEFENDANT:  In the name of God.  Your Honor, when

23   I am standing in front of the Court today I have a great

24   regret.  And I feel embarrassed in front of God and the Court.

25   My family and my friends.  I betrayed my country and my family

1   for the sake of collecting money and greed.

2          Your Honor, there is no excuse for what I did.  For

3   what I did except greed and the intent to collect money.  And

4   I was forced to do this by the difficult financial

5   circumstances I was facing.  This is what forced me to follow

6   an unlawful way.  Yes, I did believe that this is the easiest

7   way to make money, but this is wrong.

8          As a defendant waiting in prison, I feel sorry,

9   extremely sorry because I was arrested and I was convicted.

10  Because I was arrested.  But for me, I feel regret and sorrow.

11  Not because I was arrested, but because I gave up my dreams

12  and my morals.  And I downgraded my values in order to improve

13  my financial situation for my private interests.

14         I came to the United States, this great country, a

15  country that receives people coming from all over the world.

16  I came to the country to be safe and to enjoy security.  And

17  also to enjoy freedom, I came here escaping from the bad

18  situations politically and financially in Yemen.  This country

19  gave me a chance to have honored living and to make a living.

20  I was given all my political rights and more.

21         But due to my greed and my stupid thinking, I

22  betrayed everybody because of this greed of money.  I did

23  really pay a lot to know the difference because -- between my

24  situation before and what is facing me now.  I made a big

25  mistake that is going to be suffered by a lot of people.

1      As a defendant, as a convicted defendant, I am asking

2 mercy from God and from the Court.  The government did obtain

3 or possess everything I made in this life.  All of this

4 because I did something against the law.

5      Now I need to start a new journey in order to rebuild

6 myself.  From the beginning.  I would like mercy and

7 compassionate judgment from you, sire.  I want to thank you.

8 God bless America and its people.

9      THE COURT:  Thank you very much, Mr. Muthana.

10      Is there any legal cause why judgment should not be

11 pronounced?

12      MR. IRIGOYEN:  None, Your Honor.

13      THE COURT:  The Court recognizes that the sentencing

14 guidelines are advisory, they must be calculated and applied

15 as one sentencing factor.  The Court must also consider all

16 the 3553 factors when applying the totality of the

17 circumstances to the defendant to produce a reasonable

18 sentence.

19      I'm going to start with the guideline calculations.

20 For the offense of conviction, which includes six counts of

21 money laundering and a criminal forfeiture count, for the

22 money laundering, the guideline for the amount of $209,130

23 provides a base offense level of 20, which is based on the

24 exact amount, which is between 200 and $400,000.

25      Two levels are added because the defendant was

1    convicted under the money laundering section and no increase

2    is recommended if the offense involved a national security

3    issue.

4           There was no evidence submitted that established that

5    the defendant belonged to an organization known for terrorist

6    activities or that he sent money to such a bank account.

7    Although he was told by undercover operatives that the

8    organization, Hizballah, had an interest in the bank account.

9    The defendant has denied his motives include supporting

10   terrorists and terrorism.

11          And under the circumstances, the probation officer

12   has not recommended enhancement, either under the guidelines

13   Section 2S1.1(b)(2)(B), 2S1.1(b)(1)(iii).

14          As to a twelve level terrorism enhancement, again,

15   the probation officer indicates there is insufficient

16   information to demonstrate a terrorist act and the Court is

17   going to follow that recommendation and not enhance and the

18   government hasn't sought to enhance for acts of terrorism.

19          A three level reduction for superacceptance of

20   responsibility takes the adjusted offense level to 19.

21          The defendant has one criminal history point for a

22   prior misdemeanor in 1997 for furnishing a minor with tobacco

23   and smoking paraphernalia.  That provides a criminal history

24   category of one.

25          For a total offense level 19, criminal history

1    category one, the guideline range is 30 to 37 months.

2    Considering the 3553 factors and the defendant's motion for

3    downward departure, the government has denied that it

4    entrapped or that it did anything more than offer the

5    opportunity to a willing participant who knew what he was

6    doing and engaged in the conduct regardless of its

7    consequences.

8            Considering the evidence that has been submitted and

9    without giving weight to the objected to evidence, Mr.

10   Muthana's own statement is the best evidence of what occurred

11   here.  He let his good judgment become impaired by his greed

12   and because of what he thought was or believed was financial

13   necessity.  And the law is very clear that financial

14   necessity, no matter how great, does not justify crime as the

15   solution to abate what that financial necessity is.

16           And these were repeated courses of conduct where

17   there were at least four separate approaches and four

18   separate, if you will, transfers of money.  First to the

19   defendant, then from the defendant to overseas accounts, which

20   result in an amount approaching $400,000, although there is a

21   dispute over 120,000 of it, whether that was part of the

22   proceeds of unlawful activity or not.

23           Since the $200,000 figure has been used, the Court

24   does not find that sentencing entrapment has been established

25   because simply, as the defendant says, he was willing to do

1    this.  He did it when the opportunity was offered and he was,

2    in effect, predisposed, ready, willing and committed these

3    crimes knowingly, recognizing it was wrong when he did it.

4          And so the Court does not believe that sentencing

5    entrapment defense is one that is established under any

6    standard of proof.

7          As to where in the guidelines the defendant ought to

8    be sentenced, the government has asked for a mid range

9    sentence.  The defendant has asked for a departure.  Probation

10   officer has recommended the low end.

11         And the Court believes a low end sentence is the

12   appropriate sentence here.  If there were more to this, the

13   Court would have a different view.  I would be imposing a much

14   higher sentence.  But here, the Court does not believe that

15   the defendant either preponderates or meets any higher

16   standard to show that Mr. Muthana was engaged in terrorism and

17   therefore a 30-month sentence is a fair sentence and the right

18   sentence given his relative lack of criminal history, given

19   the fact that previously he had been a productive citizen and

20   had essentially conducted himself in not only owning and

21   operating a business, but caring for his family.

22         That the 30 months reflects the seriousness of the

23   offense.  It will promote respect for the law.  It provides

24   just punishment and will afford adequate deterrence to others

25   and will protect the public from further crimes of the

1   defendant.

2          For all these reasons, the Court enters the following

3   judgment:  It is the judgment of the Court that the defendant

4   Abdulla Kasem Ahmed Muthana hereby committed to the custody of

5   Bureau of Prisons to be imprisoned for a term of 30 months on

6   each of counts one, two, three, four, five and six to be

7   served concurrently for a total term of 30 months.

8          He shall pay a special assessment of $600, payment to

9   begin immediately.  The Court finds that the defendant does

10  not have the ability to pay a fine, imposition of fine is

11  waived.

12         Upon your release from custody, you shall be placed

13  on supervised release for a term of 36 months on counts one,

14  two, three, four, five and six all to be served concurrently

15  for a total term of 36 months, unsupervised if you are

16  deported.

17         Within 72 hours following your release from custody,

18  you shall report in person to the probation office in the

19  district to which you are released.

20         While on supervised release, do not commit another

21  federal, state or local crime.  Do not possess a firearm.  Do

22  not illegally possess controlled substances.  Comply with

23  standard conditions recommended by the United States

24  Sentencing Commission and adopted by the Court.  Mandatory

25  drug testing is suspended based on the Court's determination

1    that the defendant poses a low risk of future substance abuse.

2            Will the parties agree I don't have to read the five

3    special conditions into the record, but they will be included

4    in the judgment?

5            MR. BOONE:  I would agree with that.  I would request

6    that the Court incorporate by reference the forfeiture ruling.

7            MR. IRIGOYEN:  And I would also --

8            THE COURT:  I'm going to --

9            MR. IRIGOYEN:  -- request the Court recommend a

10   California institution.

11           THE COURT:  Yes, I will.

12           I am going to find that the property seized in cash

13   from the defendant was -- the proceeds were facilitated or

14   contributed to the conduct of the illegal course of conduct

15   the defendant was engaged in.  And that accordingly, a

16   preliminary order of forfeiture will be issued in accordance

17   with the defendant's agreement.

18           I believe appeal rights in this case have been

19   waived.  I don't want to impair a valid and subsisting waiver.

20   Therefore, I will not advise as to appeal rights.

21           Do you agree, Mr. Irigoyen?

22           MR. IRIGOYEN:  Yes, Your Honor.

23           THE COURT:  I will recommend a California institution

24   based on the presence of family members in the State of

25   California.

25

1        Are there other counts?

2        MR. BOONE:  No, Your Honor.  That's it.  There are no

3  other counts.

4        THE COURT:  There are no other counts?

5        MR. BOONE:  No.  He pled to a superseding

6  information.

7        THE COURT:  Don't we dismiss the indictment then?

8        MR. BOONE:  Well, I thought a --

9        THE COURT:  It hasn't been dismissed.

10        MR. BOONE:  All right.  Then I'll dismiss it

11  for -- at this time the government moves to dismiss the

12  indictment in the interest of justice.

13        THE COURT:  All right.  The indictment against the

14  defendant is dismissed on motion of the government in the

15  interest of justice.  Anything further?

16        MR. BOONE:  No, Your Honor.

17        MR. IRIGOYEN:  No, Your Honor.

18        MR. BOONE:  Thank you.

19        THE COURT:  You're welcome.

20        (The proceedings were concluded at 2:11 p.m.)

21

22        I, KAREN HOOVEN, Official Reporter, do hereby certify

23  that the foregoing transcript as true and correct.

24

25  DATED:   12/20/2010              /s/  Karen Hooven
                                     KAREN HOOVEN, RMR-CRR